## HISQUIERDO *v.* HISQUIERDO

No. 77–533.   Argued November 1, 1978—Decided January 22, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, and STEVENS, JJ.,

joined. STEWART, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 591.

*James D. Endman* argued the cause and filed a brief for petitioner.

*Howard M. Fields* argued the cause *pro hac vice* for respondent. On the brief was *Ray C. Bennett.*

*Elinor H. Stillman* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General McCree, H. Bartow Farr III,* and *Edward S. Hintzke.*

*Herma Hill Kay* argued the cause for the NOW Legal Defense and Education Fund as *amicus curiae* urging affirmance. With her on the brief was *Bruce K. Miller.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Petitioner Jess H. Hisquierdo in 1975 sued to dissolve his marriage with respondent Angela Hisquierdo. The Supreme Court of California, in applying the State's community property rules, awarded respondent an interest in petitioner's expectation of ultimately receiving benefits under the Railroad Retirement Act of 1974, 88 Stat. 1305, 45 U. S. C. § 231 *et seq.* The issue here is whether the Act prohibits this allocation and division of benefits.

I

The Railroad Retirement Act, first passed in 1934, 48 Stat. 1283, provides a system of retirement and disability benefits for persons who pursue careers in the railroad industry. Its sponsors felt that the Act would encourage older workers to retire by providing them with the means "to enjoy the closing days of their lives with peace of mind and physical comfort," and so would "assure more rapid advancement in the service"

---

*\*Judith Lichtman* filed a brief for Patricia Schroeder et al. as *amici curiae* urging affirmance.

and also more jobs for younger workers.[1] Both employees and carriers pay a federal tax[2] which funds a Railroad Retirement Account. The Railroad Retirement Board, provided for by the Act, 45 U. S. C. § 231f, disburses benefits from the account to each eligible "individual," 45 U. S. C. § 231a.

In its modern form,[3] the Act resembles both a private pension program and a social welfare plan. It provides two tiers of benefits. The upper tier, like a private pension, is tied to earnings and career service. An employee, to be eligible for benefits, must work in the industry 10 years. Absent disability, no benefit is paid, however, until the employee either reaches age 62 or is at least 60 years old and has completed 30 years of service. 45 U. S. C. § 231a (a)(1). Like a social welfare or insurance scheme, the taxes paid by

---

[1] H. R. Rep. No. 1711, 74th Cong., 1st Sess., 10 (1935).

[2] Railroad Retirement Tax Act, 26 U. S. C. §§ 3201–3233.

[3] This Court ruled that the Railroad Retirement Act of 1934 was unconstitutional and did so on the ground that it took property in violation of the Fifth Amendment and exceeded Congress' power under the Interstate Commerce Clause. *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330 (1935). Congress then promptly enacted substantially similar legislation in 1935 based on its power to tax and spend to promote the general welfare. 49 Stat. 967 and 974. The operation of that legislation was enjoined. *Alton R. Co.* v. *Railroad Retirement Board,* 16 F. Supp. 955 (DC 1936). After Presidential intervention and extensive negotiation, a bill was produced that became the Railroad Retirement Act of 1937. 50 Stat. 307. That Act was amended several times to make it conform more closely to the existing Social Security Act. In 1970 Congress established a Commission on Railroad Retirement to study the actuarial soundness of the system. The Commission submitted a report, The Railroad Retirement System: Its Coming Crisis, H. R. Doc. No. 92–350 (1972). Further industry negotiation produced the bill that became the 1974 Act. See *id.,* at 55–75; Hearing on Women and Railroad Retirement before the Subcommittee on Retirement Income and Employment of the Select House Committee on Aging, 94th Cong., 1st Sess. (1976) (Hearing on Women and Railroad Retirement).

and on behalf of an employee do not necessarily correlate with the benefits to which the employee may be entitled. Since 1950, the Railroad Retirement Account has received substantial transfers from the social security system, and legislative changes made in 1974 were expected to require a one-time infusion of $7 billion in general tax revenues.[4]

The lower, and larger, tier of benefits corresponds exactly to those an employee would expect to receive were he covered by the Social Security Act. 45 U. S. C. § 231b (a)(1). The Act provides special benefits for the children or parent of a worker who dies. §§ 231a (d)(1)(iii) and (iv). It also makes detailed provision for a worker's spouse; the spouse qualifies for an individual benefit if the spouse lives with the employee, and receives regular contributions from the employee for support, or is entitled to support from the employee pursuant to a court order. § 231a (c)(3)(i). The benefits terminate, however, when the spouse and the employee are absolutely divorced. § 231d (c)(3).[5]

Like Social Security, and unlike most private pension plans, railroad retirement benefits are not contractual. Congress may alter, and even eliminate, them at any time.[6] This vulnerability to congressional edict contrasts strongly with the protection Congress has afforded recipients from creditors,

---

[4] See H. R. Doc. No. 92–350 (1972); Skolnik, Restructuring the Railroad Retirement System, 38 Soc. Sec. Bull., No. 4, p. 23 (1975).

[5] "The entitlement of a spouse of an individual to an annuity under section 231a (c) of this title shall end on the last day of the month preceding the month in which . . . the spouse and the individual are absolutely divorced . . . ."

[6] The Social Security Act specifically provides: "The right to alter, amend, or repeal any provision of this [Act] is reserved to the Congress." 49 Stat. 648, 42 U. S. C. § 1304. While the Railroad Retirement Act does not expressly incorporate that very language, it definitely does so indirectly, because the minimum Railroad Retirement Act benefit is the benefit that would have been received under the Social Security Act. See 45 U. S. C. § 231b (a)(1).

taxgatherers, and all those who would "anticipate" the receipt of benefits:

"Notwithstanding any other law of the United States, or of any State, territory, or the District of Columbia, no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated . . . ." 45 U. S. C. § 231m.[7]

In 1975, Congress made an exception to § 231m and similar provisions in all other federal benefit plans. Concerned about recipients who were evading support obligations and thereby throwing children and divorced spouses on the public dole, Congress amended the Social Security Act by adding a new provision, § 459, to the effect that, notwithstanding any contrary law, federal benefits may be reached to satisfy a legal obligation for child support or alimony. 88 Stat. 2357, 42 U. S. C. § 659.[8] In 1977, shortly before the issuance of the Supreme Court of California's opinion in this case, Congress added to the Social Security Act a definitional statute, § 462 (c), which relates to § 459 and limits "alimony" to its tra-

---

[7] The goal of this provision, in the words of a union negotiator who testified, was "to make it sure that the annuitant gets the pension." Hearings on S. 2395 before the Senate Committee on Interstate Commerce, 75th Cong., 1st Sess., 29 (1937) (statement of George M. Harrison, president of the Brotherhood of Railway Clerks).

[8] The consent provision reads in its entirety:

"Notwithstanding any other provision of law, effective January 1, 1975, moneys (the entitlement to which is based upon remuneration for employment) due from, or payable by, the United States (including any agency or instrumentality thereof and any wholly owned Federal corporation) to an individual, including members of the armed services, shall be subject, in like manner and to the same extent as if the United States were a private person, to legal process brought for the enforcement, against such individual of his legal obligations to provide child support or make alimony payments."

ditional common-law meaning of spousal support. That statute states specifically that "alimony"

> "does not include any payment or transfer of property or its value by an individual to his spouse or former spouse in compliance with any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses." Pub. L. 95–30, Tit. V, § 501 (d), 91 Stat. 160.[9]

## II

Petitioner and respondent, who are California residents, were married in Nevada in 1958. They separated in 1972. In 1975 petitioner instituted this proceeding in the Superior Court of California, County of Los Angeles, for dissolution of the marriage. California, like seven other States, by statute has a form of community property law brought to our shores by the Spanish. In California the

> "statute proceeds upon the theory that the marriage, in respect to property acquired during its existence, is a community of which each spouse is a member, equally contributing by his or her industry to its prosperity, and possessing an equal right to succeed to the property after

---

[9] The entire definition reads:

"The term 'alimony,' when used in reference to the legal obligations of an individual to provide the same, means periodic payments of funds for the support and maintenance of the spouse (or former spouse) of such individual, and (subject to and in accordance with State law) includes but is not limited to, separate maintenance, alimony pendente lite, maintenance, and spousal support; such term also includes attorney's fees, interest, and court costs when and to the extent that the same are expressly made recoverable as such pursuant to a decree, order, or judgment issued in accordance with applicable State law by a court of competent jurisdiction. Such term does not include any payment or transfer of property or its value by an individual to his spouse or former spouse in compliance with any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses."

dissolution, in case of surviving the other." *Meyer* v. *Kinzer*, 12 Cal. 247, 251 (1859).[10]

Community property includes the property earned by either spouse during the union, as well as that given to both during the marriage. See Cal. Civ. Code Ann. § 687 (West 1954). It contrasts with separate property, which includes assets owned by a spouse before marriage or acquired separately by a spouse during marriage through gift. In community property States, ownership turns on the method and timing of acquisition, while the traditional view in common-law States is that ownership depends on title.[11] On the theory that petitioner acquired an expectation of receiving Railroad Retirement Act benefits due in part to his labors while married, respondent (but not petitioner) in the California divorce proceeding listed that expectation as an item of community property subject to division upon dissolution of the marriage. App. 2, 3.

At the time, petitioner, a railroad machinist, was aged 55. He had worked from 1942 to 1975 for the Atchison, Topeka & Santa Fe Railway, and subsequently entered the employ of the Los Angeles Union Passenger Terminal. Both jobs fell within the Act. Because petitioner had 30 years' service, the statute would permit him to receive benefits if and when he attained age 60. Respondent calculated that she was entitled to half the benefits attributable to his labor during the 14 years of their marriage, or, by her estimates, 19.6% of the total benefits to be received.[12] The couple has no children.

[10] See also Cal. Civ. Code Ann. § 4800 (West Supp. 1978); W. deFuniak & M. Vaughn, Principles of Community Property § 1 (2d ed. 1971).

[11] *Ibid.* Only a small minority of common-law States still adhere strictly to the view that title alone controls the distribution of property on divorce. Foster & Freed, From a Survey of Matrimonial Laws in the United States: Distribution of Property Upon Dissolution, 3 Comm. Prop. J. 231, 232 (1976).

[12] Reporter's transcript on appeal in No. D 860954 (Super. Ct. Los Angeles) 23; Tr. of Oral Arg. 32.

Respondent in 1975 was 53. She had worked for the preceding eight years in a factory. She had been gainfully employed for 35 years and had an expectation that upon her retirement she would be entitled to benefits under the Social Security Act. Neither petitioner nor respondent claimed that her expectation of receiving those benefits was community property. App. 2, 3.

Respondent, and petitioner, too, waived their claims to spousal support. Tr. of Oral Arg. 5, 33. After its hearing, the Superior Court awarded petitioner the couple's home, in which they had a $12,828 equity, and its furnishings. Respondent was awarded an automobile and a small interest in a mutual fund. The court, however, ordered petitioner to reimburse respondent, by installment payments, for her half of the equity in the home and protected this obligation with an imposed lien in her favor on the real estate. The court ruled that no community interest existed either in petitioner's prospect of receiving Railroad Retirement Act benefits or in respondent's anticipation of benefits under the Social Security Act. App. 4.

The California Court of Appeal affirmed. *In re Hisquierdo*, 133 Cal. Rptr. 684 (2d Dist. 1976). The court, noting that under this Court's Supremacy Clause cases Congress has the power to determine the character of a federally created benefit, rejected respondent's claim that petitioner's expectation of receiving Railroad Retirement Act benefits was community property. The court reasoned that, because federal pension programs may be terminated by Congress at any time, petitioner had no enforceable contract right. Respondent contended that the state court, under the decision in *In re Milhan*, 13 Cal. 3d 129, 528 P. 2d 1145 (1974), cert. denied, 421 U. S. 976 (1975), could determine the expected value of her interest and award her a compensating amount of other property available for distribution. The court held, however, that such a remedy would be contrary to § 231m, which provides that

benefits are not to be "anticipated," and would frustrate the explicit and detailed terms of the Act that grant the employee a benefit separate and distinct from the nonemployee spouse's benefit that terminates upon absolute divorce. See also *In re Nizenkoff*, 65 Cal. App. 3d 136, 135 Cal. Rptr. 189 (1st Dist. 1976) (expectation of receiving benefits under the Social Security Act); *In re Kelley*, 64 Cal. App. 3d 82, 134 Cal. Rptr. 259 (2d Dist. 1976) (the same).

Review was granted by the Supreme Court of California. Respondent there argued that "there is absolutely no evidence that Congress ever intended to prevent a community property state from recognizing a spouse's community interest in a Railroad Retirement Act retirement plan." [13] In a unanimous opinion that court reversed the Court of Appeal. *In re Hisquierdo*, 19 Cal. 3d 613, 566 P. 2d 224 (1977). Relying on its recent case law,[14] the Supreme Court of California held that because the benefits would flow in part from petitioner's employment during marriage, they were community property even though under federal law petitioner had no enforceable contract right. Congress' decision to terminate benefits for divorced spouses, the court believed, was evidence that Congress intended to rely on traditional state-law doctrines to protect them. The court rejected petitioner's contention that § 231m barred respondent's claim. The court reasoned that it was intended to bar creditors, and respondent was not a creditor but a present owner. The then very recent 1977 amendment to the Social Security Act (mentioned above as the new

---

[13] Petition for Hearing in No. LA 30712 (Cal. Sup. Ct.), p. 14.

[14] *In re Fithian*, 10 Cal. 3d 592, 517 P. 2d 449, cert. denied, 419 U. S. 825 (1974) (federal military retirement pay); cf. *In re Brown*, 15 Cal. 3d 838, 544 P. 2d 561 (1976) (nonvested interest in a private employer's retirement plan); see generally Martin, Social Security Benefits for Spouses, 63 Cornell L. Rev. 789, 830–836 (1978); Reppy, Community and Separate Interests in Pensions and Social Security Benefits after *Marriage of Brown* and ERISA, 25 UCLA L. Rev. 417–421, 429–443, 483–511 (1978) (discussing cases) (hereinafter Interests in Pensions).

§ 462 (c) of that Act) was not discussed. The question of remedy was left open for decision on remand. The court indicated that by awarding respondent compensating property under the doctrine of *In re Milhan, supra,* a court could avoid any infringement on the Act's designation of petitioner as the "individual" recipient.

We granted certiorari to consider whether, under the standard of this Court's decided Supremacy Clause cases, the award to respondent impermissibly conflicts with the Railroad Retirement Act.[15]   435 U. S. 994 (1978).

### III

Insofar as marriage is within temporal control, the States lay on the guiding hand.   "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."   *In re Burrus,* 136 U. S. 586, 593–594 (1890).   Federal courts repeatedly have declined to assert jurisdiction over divorces that presented no federal question.   See, *e. g., Ohio ex rel. Popovici* v. *Agler,* 280 U. S. 379 (1930).   On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be pre-empted.   *Wetmore* v. *Markoe,* 196 U. S. 68, 77 (1904). A mere conflict in words is not sufficient.   State family and family-property law must do "major damage" to "clear and substantial" federal interests before the Supremacy Clause will demand that state law be overridden.   *United States* v. *Yazell,* 382 U. S. 341, 352 (1966).

---

[15] Texas courts have divided on the question whether an expectation of receiving Railroad Retirement Act benefits is community property.   Compare *Allen* v. *Allen,* 363 S. W. 2d 312 (Tex. Civ. App., Houston, 1962) with *Eichelberger* v. *Eichelberger,* 557 S. W. 2d 587 (Tex. Civ. App., Waco, 1977) (writ dismissed).

Nevertheless, on at least four prior occasions this Court has found it necessary to forestall such an injury to federal rights by state law based on community property concepts. In *McCune* v. *Essig*, 199 U. S. 382 (1905), federal homestead law, which permitted a widow to patent federal land that had been entered by her husband, prevailed over a daughter's asserted inheritance of her father's expectancy that the patent would issue to him. And in a trilogy of cases, the Court held that the survivorship rules in federal savings bond and military life insurance programs override community property law, absent fraud or breach of trust by the decedent. *Yiatchos* v. *Yiatchos*, 376 U. S. 306, 309 (1964); *Free* v. *Bland*, 369 U. S. 663 (1962); *Wissner* v. *Wissner*, 338 U. S. 655 (1950).

This case, like those four, has to do with a conflict between federal and state rules for the allocation of a federal entitlement. The manipulation problem that concerned the Court in *Yiatchos* v. *Yiatchos* and *Free* v. *Bland*, however, cases in which savings bonds were purchased with community property, is not present here. Railroad Retirement Act benefits from their very inception have federal overtones. Compulsory federal taxes finance them and not just the taxes that fall on the employee. The benefits more closely parallel the land homesteaded in *McCune* v. *Essig*. Because the United States owned the land, title to it could not pass in a manner contrary to federal law, 199 U. S., at 390, even though a matter of that kind normally is left to the States. Here, California must defer to the federal statutory scheme for allocating Railroad Retirement Act benefits insofar as the terms of federal law require. The critical terms here include a specified beneficiary protected by a flat prohibition against attachment and anticipation. In *Wissner* v. *Wissner, supra,* the Court interpreted a somewhat similar provision [16] to pre-

---

[16] The statute provided that payments to the named beneficiary "shall be exempt from the claims of creditors, and shall not be liable to attachment, levy; or seizure by or under any legal or equitable process whatever,

clude a division for community property purposes, 338 U. S., at 659–660, even though Congress had not spoken with the specificity that characterizes the Social Security Act amendments that inform our decision here.

The approach must be practical. The federal nature of the benefits does not by itself proscribe the entire field of state control. Petitioner contends, as the California Court of Appeal held, that the States may not create rights to these benefits that do not exist under federal law. Petitioner accordingly says that, because not even petitioner "owns" benefits until Congress has determined that they be paid, the Supreme Court of California erred in describing respondent as a present owner of an expectancy in those benefits. Such rights in the abstract, however, do not necessarily cause the injury to federal law that the Supremacy Clause forbids. The pertinent questions are whether the right as asserted conflicts with the express terms of federal law and whether its consequences sufficiently injure the objectives of the federal program to require nonrecognition.

## A

The first way in which respondent seeks to vindicate her community property interest, one particularly pressed at oral argument, Tr. of Oral Arg. 32, 44, is that the Superior Court would retain jurisdiction and order petitioner to pay her an appropriate portion of his benefit, or its monetary equivalent, as petitioner receives it. See *In re Brown*, 15 Cal. 3d 838, 848–850, 544 P. 2d 561, 567–568 (1976). That course, however, runs contrary to the language and purpose of § 231m and would mechanically deprive petitioner of a portion of the benefit Congress, in § 231d (c)(3), indicated was designed for him alone.

Section 231m plays a most important role in the statu-

---

either before or after receipt by the beneficiary." 49 Stat. 609, 38 U. S. C. § 454a (1946 ed.).

tory scheme. Like anti-attachment provisions generally, see *Philpott* v. *Essex County Welfare Board,* 409 U. S. 413 (1973); *Wissner* v. *Wissner, supra,* it ensures that the benefits actually reach the beneficiary. It pre-empts all state law that stands in its way. It protects the benefits from legal process "[n]otwithstanding any other law . . . of any State." Even state tax-collection laws must bow to its command, for Congress added that phrase in an amendment designed in part to ensure that neither federal nor state tax collectors would encroach on the distribution of benefits.[17] It prevents the vagaries of state law from disrupting the national scheme, and guarantees a national uniformity that enhances the effectiveness of congressional policy.

Congress carefully targeted the benefits created by the Railroad Retirement Act. It even embodied a community concept to an extent. The Act provides a benefit for a spouse, but the spouse need not have worked for a carrier. The spouse's sole contribution is to the marital community that supports the employee who has made railroad employment a career. Congress purposefully abandoned that theory, however, in allocating benefits upon absolute divorce. In direct language the spouse is cut off:

> "The entitlement of a spouse of an individual to an annuity . . . shall end on the last day of the month pre-

---

[17] Senator John F. Kennedy described the amendment on the floor of the Senate:

"[The amendment] makes it clear that railroad retirement and unemployment benefits are still exempt from Federal or State taxation, garnishment and attachment, a clarification made necessary by an inadvertent oversight in last year's new tax law and doubts raised in several States." 101 Cong. Rec. 11772 (1955).

See S. Rep. No. 1040, 84th Cong., 1st Sess., 9–10 (1955); Hearing on S. 1589 before the Subcommittee on Railroad Retirement of the Senate Committee on Labor and Public Welfare, 84th Cong., 1st Sess., 29–30 (1955) (remarks of Lester P. Schoene, representing all standard railway labor organizations). See also Rev. Rul. 70–343, 1970–2 Cum. Bull. 4.

ceding the month in which . . . the spouse and the individual are absolutely divorced." 45 U. S. C. § 231d (c)(3).

The choice was deliberate. When the Act was revised in 1974, a proposal was made to award a divorced spouse a benefit like that available to a divorced spouse under the Social Security Act. The labor-management negotiation committee, however, rejected that proposal, and Congress ratified its decision. It based its conclusion on the perilous financial state of the Railroad Retirement Account, and the need to devote funds to other purposes.[18]

Congress has made a choice, and § 231m protects it. It is for Congress to decide how these finite funds are to be allocated. The statutory balance is delicate. Congress has fixed an amount thought appropriate to support an employee's old age and to encourage the employee to retire. Any automatic diminution of that amount frustrates the congressional objective. By reducing benefits received, it discourages the divorced employee from retiring. And it provides the employee with an incentive to keep working, because the former spouse has no community property claim to salary earned after the marital community is dissolved. Section 231m shields the distribution of benefits from state decisions that would actually reverse the flow of incentives Congress originally intended.

Respondent contends that this interpretation of the Act is manifestly unjust, and could not have been intended by

---

[18] Hearing on Women and Railroad Retirement 5. The 1972 Report of the Commission on Railroad Retirement said that industry employment, 1.68 million during World War II, had fallen to 582,000 by the first quarter of 1972. The system's beneficiaries already outnumbered the employees who were contributing. The Commission said that, without the changes that it suggested and that Congress embodied in the 1974 Act, the system's funds would be consumed by 1988. H. R. Doc. No. 92–350, pp. 10, 12, 18 (1972).

Congress. She suggests that her contribution to the marital community merits recompense, and she argues that, as a logical matter, Congress would not have terminated the spouse's benefit upon absolute divorce if it had thought that a divorced spouse would be totally unable to assert a state-law claim against the benefits received by the employee spouse. She urges that, at least with respect to spousal claims, the Court should hold that § 231m does no more than restate the Government's sovereign immunity from burdensome garnishment suits, and so has no effect on her right to require petitioner to reimburse her as he receives benefits. She notes that several courts have adopted this construction in holding that an errant spouse could be forced to pay child and spousal support upon receipt of Railroad Retirement Act payments.[19]

We, however, cannot so lightly discard the settled view that anti-assignment statutes have substantive meaning. Section 231m goes far beyond garnishment. It states that the annuity shall not be subject to any "legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated." Its terms make no exception for a spouse. The judicial construction on which respondent relies is a child of equity, not of law. In *Wissner*, the Court held that a similar line of authority did not apply to community property claims:

"Venerable and worthy as this community is, it is not, we think, as likely to justify an exception to the congressional language as specific judicial recognition of particular

---

[19] See *LaFarr* v. *LaFarr*, 132 Vt. 191, 315 A. 2d 235 (1974); *Heuchan* v. *Heuchan*, 38 Wash. 2d 207, 228 P. 2d 470 (1951); *Commonwealth* v. *Berfield*, 160 Pa. Super. 438, 51 A. 2d 523 (1947). (Before the 1974 revision of the Act, the § 231m exemption was codified as § 228*l*. See 45 U. S. C. § 228*l* (1970 ed.).)

The dissenting opinion, *post*, at 598–600, argues that § 231m is irrelevant because respondent is a co-owner. Surely, however, inability to use any "legal process under any circumstances whatsoever" to enforce her asserted rights is a severe limitation on the nature of any ownership interest she might otherwise enjoy under state law.

needs, in the alimony and support cases." 338 U. S., at 660.

Now Congress has written into law the same distinction *Wissner* drew as a matter of policy. The 1977 amendments to the Social Security Act, by way of amending the existing § 459 and adding a new § 462, expressly override § 231m, and even facilitate garnishment for claims based on spousal support. They decline to do so, however, for community property claims. The legislative history is sparse and does not mention *Wissner*.[20] We know, however, that the purpose of § 459 was to help children and divorced spouses get off welfare. It is therefore logical to conclude that Congress, in adopting § 462 (c), thought that a family's need for support could justify garnishment, even though it deflected other federal benefit programs from their intended goals, but that community property claims, which are not based on need, could not do so.

---

[20] Section 459, added to the Social Security Act in 1975, overrides § 231m for "alimony" claims. It was part of a package of measures primarily designed to combat increases in welfare payments resulting from an inability to compel payment of support obligations from solvent but unwilling parents. S. Rep. No. 93–1356, pp. 42–43 (1974). After the section's adoption, courts disagreed on whether the alimony that could be made the subject of garnishment included community property. Compare *United States* v. *Stelter*, 553 S. W. 2d 227, 229 (Tex. Civ. App. 1977), rev'd, 567 S. W. 2d 797 (Tex. 1978); *Williams* v. *Williams*, 338 So. 2d 869 (Fla. App. 1976), with *Marin* v. *Hatfield*, 546 F. 2d 1230 (CA5 1977); *Kelley* v. *Kelley*, 425 F. Supp. 181, 183 (WD La. 1977). In 1977, Congress added § 462 (c) and resolved that question. The amendment was the subject of a prior Committee Report, S. Rep. No. 94–1350 (1976). Senator Nunn said that its purpose was to clarify prior law. Neither he nor the Committee explained why property divisions were excluded. See 123 Cong. Rec. 12909–12914, 12958–12959 (1977). Companion measures both established procedures to make garnishment more efficient, and amended § 303 of the Consumer Credit Protection Act, 15 U. S. C. § 1673 (b), to pre-empt state law by limiting garnishments to less than 65% of the remuneration received for employment, including retirement benefits. Pub. L. 95–30, Tit. V., § 501 (e)(2), 91 Stat. 161.

## B

Respondent contends that she can vindicate her interest and leave the benefit scheme intact by pursuing her remedy under *In re Milhan,* 13 Cal. App. 3d 129, 528 P. 2d 1145 (1974). She seeks an offsetting award of presently available community property to compensate her for her interest in petitioner's expected benefits. As petitioner's counsel bluntly put it, respondent wants the house. Tr. of Oral Arg. 5. The expected value of the benefits is such that she could get it if this remedy were adopted.

An offsetting award, however, would upset the statutory balance and impair petitioner's economic security just as surely as would a regular deduction from his benefit check. The harm might well be greater. Section 231m provides that payments are not to be "anticipated." Legislative history throws little light on the meaning of this word.[21] In the law of trusts, however, a prohibition against anticipation is commonly understood to mean that "the interest of a sole beneficiary shall not be paid to him before a certain date." E. Griswold, Spendthrift Trusts § 512, p. 583 (2d ed. 1947).[22] The

---

[21] The original statute, enacted in 1934, contained a prohibition against attachment but not the phrase "nor shall the payment thereof be anticipated." Act of June 27, 1934, ch. 868, § 11, 48 Stat. 1288. The quoted phrase was added without explanation in 1935 and carried over in each later re-enactment of the statute. Act of Aug. 29, 1935, ch. 812, § 10, 49 Stat. 973; Act of June 24, 1937, ch. 382, § 12, 50 Stat. 316; Act of Oct. 16, 1974, Pub. L. 93–445, § 14, 88 Stat. 1345. The Committee Reports attach no special meaning to it. See, *e. g.,* H. R. Rep. No. 1711, 74th Cong., 1st Sess., 12 (1935). It was mentioned during the hearings, but not discussed. See Hearing on H. R. 6956 before the House Committee on Interstate and Foreign Commerce, 75th Cong., 1st Sess., 69 (1937); Hearings on S. 3151 before a Subcommittee of the Senate Committee on Interstate Commerce, 74th Cong., 1st Sess., 16 (1935). Congress has employed an identical phrase in the Railroad Unemployment Insurance Act, 52 Stat. 1096, as amended, 45 U. S. C. § 352 (e).

[22] In *Hetrick* v. *Reading Co.,* 39 F. Supp. 22 (NJ 1941), the prohibition against anticipation was applied in this sense. The court held that a

Railroad Retirement Act resembles a trust in certain respects. If that definition is applied here, then the offsetting award respondent seeks would improperly anticipate payment by allowing her to receive her interest before the date Congress has set for any interest to accrue.

Any such anticipation threatens harm to the employee, and corresponding frustration to federal policy, over and above the mere loss of wealth caused by the offset. If, for example, a nonemployee spouse receives offsetting property, and then the employee spouse dies before collecting any benefits, the employee's heirs or beneficiaries suffer to the extent that the offset exceeds the lump-sum death benefits the Act provides. See 45 U. S. C. § 231e. Similarly, if the employee leaves the industry before retirement, and so fails to meet the "current connection with the railroad industry" requirement for certain supplemental benefits, see 45 U. S. C. § 231a (b)(1)(iv), the employee never will fully regain the amount of the offset. A third possibility, of course, is that Congress might alter the terms of the Act. In 1974, Congress eliminated certain double benefits accruing after 1982.[23] If past California property settlements had been based on those benefits, then the change in the Act would have worked a multiple penalty on future recipients. By barring lump-sum community property settlements based on mere expectations, the prohibition against anticipation prevents such an obvious frustration of congressional purpose. It also preserves congressional freedom to amend the Act, and so serves much the same function as the frequently stated understanding that programs of this nature convey no future rights and so may be changed without

---

defendant employer could not offset a tort claim by the amount the plaintiff expected to receive in Railroad Retirement Act disability benefits.

[23] See 45 U. S. C. § 231b (f)(2); S. Rep. No. 93–1163 (1974); H. R. Rep. No. 93–1345 (1974). For a similar catalog of uncertainties surrounding the payment of future social security benefits, see Interests in Pensions 529–533.

taking property in violation of the Fifth Amendment. See *Richardson v. Belcher*, 404 U. S. 78, 80–81 (1971); *Flemming v. Nestor*, 363 U. S. 603, 608–611 (1960); *Ruhl v. Railroad Retirement Board*, 342 F. 2d 662, 666 (CA7), cert. denied, 382 U. S. 836 (1965).

## IV

We are mindful that retirement benefits are increasingly important in American life and that divorce is becoming more frequent. The burden of marital dissolution may be particularly onerous for a spouse who, unlike respondent, has no expectation of receiving his or her own social security benefits. The 1975 and 1977 amendments, however, both permit and encourage garnishment of Railroad Retirement Act benefits for the purposes of spousal support, and those benefits will be claimed by those who are in need. Congress may find that the distinction it has drawn is undesirable. Indeed, Congress recently has passed special legislation to allow garnishment of Civil Service Retirement benefits for community property purposes. See Pub. L. 95–366, 92 Stat. 600.

For the present, however, the community property interest that respondent seeks conflicts with § 231m, promises to diminish that portion of the benefit Congress has said should go to the retired worker alone,[24] and threatens to penalize one whom Congress has sought to protect. It thus causes the kind of injury to federal interests that the Supremacy Clause forbids. It is not the province of state courts to strike a balance different from the one Congress has struck.

---

[24] In this case, Congress has granted a separate spouse's benefit, and has terminated that benefit upon absolute divorce. Different considerations might well apply where Congress has remained silent on the subject of benefits for spouses, particularly when the pension program is a private one which federal law merely regulates. See Employee Retirement Income Security Act of 1974, 88 Stat. 829, 29 U. S. C. § 1001 *et seq.* Our holding intimates no view concerning the application of community property principles to benefits payable under programs that possess these distinctive characteristics.

The judgment of the Supreme Court of California is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST joins, dissenting.

We are asked in this case to decide whether federal law prohibits the State of California from treating as community property a divorcing husband's expectancy interest in pension benefits afforded under the Railroad Retirement Act of 1974. There can be no doubt that the State is free to treat this interest as property. *Herb* v. *Pitcairn,* 324 U. S. 117, 125–126. The only question, therefore, is whether something in the federal Act prevents the State from applying its normal substantive property law, under which assets acquired during marriage are commonly owned by the husband and wife. From the Court's own review of the Railroad Retirement Act, it is apparent to me that the asserted federal conflict with California community property law—far from being grounded upon the concrete expressions that ordinarily are required to support a finding of federal pre-emption, see, *e. g., Wissner* v. *Wissner,* 338 U. S. 655—is patched together from statutory provisions that have no relationship at all to substantive marital property rights. Indeed, the federal "policies" the Court perceives amount to little more than the commonplace that retirement benefits are designed to provide an income on retirement to the employee. There is simply nothing in the Act to suggest that Congress meant to insulate these pension benefits from the rules of ownership that in California are a normal incident of marriage.

I

Congress, when it acts, ordinarily does so "against the background of the total *corpus juris* of the states." *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S. 63, 68 (citation

omitted). In any case where it is claimed that a federal statute pre-empts state substantive law, therefore, it is essential to understand what the state law is. *Perez* v. *Campbell,* 402 U. S. 637, 644; *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware,* 414 U. S. 117. Although the question here arises in the context of a proceeding to dissolve a marriage, the state law at issue has to do with the ownership of property *during* marriage. Despite the Court's repeated suggestions to the contrary, community property law is simply not a body of law that is designed to provide a "benefit" for a divorced spouse.

"Community of property between husband and wife is that system whereby the property which the husband and wife have is common property, that is, it belongs to both by halves." W. deFuniak & M. Vaughn, Principles of Community Property § 1, p. 1 (2d ed. 1971) (hereinafter Principles). This definition of the property rights of a married couple was first recognized in written form in 693 A. D. in Visigothic Spain, *id.,* § 2, p. 3, and now prevails in eight States of the Union. As we have recognized many times in the past, the community property system reflects a concept of property and of the marital relationship entirely different from that at common law. See *Poe* v. *Seaborn,* 282 U. S. 101; *Bender* v. *Pfaff,* 282 U. S. 127; *Hopkins* v. *Bacon,* 282 U. S. 122; *United States* v. *Yazell,* 382 U. S. 341. See generally Principles. Fundamental to the system is the premise that husband and wife are equal partners in marriage. *Id.,* § 2, p. 5; W. Reppy & W. deFuniak, Community Property in the United States 13 (1975). Each is deemed to make equal contributions to the marital enterprise, and each accordingly shares equally in its assets. Principles § 11.1, p. 28.

Under the Spanish ganancial system followed in our community property States, property acquired before the marriage or after its termination is the separate property of the spouse who acquired it. *Id.,* § 1, p. 1; Prager, The Persistence of Separate Property Concepts in California's Community Prop-

erty System, 1849–1975, 24 UCLA L. Rev. 1, 6 (1976). All property acquired during the marriage, however, is presumed to be community property. See, *e. g., Meyer* v. *Kinzer,* 12 Cal. 247, 251–252. The presumption is regarded as a rule of substantive property law, not one of procedure or evidence. *Nilson* v. *Sarment,* 153 Cal. 524, 96 P. 315. Cf. *Poe* v. *Seaborn, supra.* In general, all property which stems from the labors of either spouse during the marriage, "irrespective of direct contributions to its acquisition or the condition of title" is, in the absence of an agreement between the spouses to the contrary, community property. Prager, *supra,* at 6. The spouses are deemed to have contributed equally to the acquisition of the property, regardless of the actual division of labor in the marriage and regardless of whether only one spouse formally "earned" it. *Ibid.*[1]

The interests of the spouses in the assets of the marital community are "during continuance of the marriage relation . . . present, existing and equal interests." Cal. Civ. Code Ann. § 5105 (West Supp. 1978). Upon dissolution of the marriage, each possesses an equal and absolute right to his or her one-half interest. *Meyer* v. *Kinzer, supra,* at 251–252; *In re Marriage of Brown,* 15 Cal. 3d 838, 848, 544 P. 2d 561, 567. The right of each spouse to his or her share of the community assets, then, is a substantive property right entirely distinct from the right that a spouse might have to the award of alimony upon dissolution of the marriage. A community property settlement merely distributes to the spouses property which, by virtue of the marital relationship, he or she already owns. An alimony award, by contrast, reflects a

---

[1] This rule obtains regardless of the relative wealth of the parties. As stated in an early compilation of the Spanish civil law:

"Although the husband may have more than the wife, or the wife more than the husband, in realty or in personalty, let the fruits be common to both." Novisima Recopilacion, Book 10, Tit. 4, Law 3, quoted in Principles § 66, p. 143 n. 72.

judgment that one spouse—even after the termination of the marriage—is entitled to continuing support by the other.

In California, retirement benefits attributable to employment during marriage are community property. *In re Marriage of Brown, supra.* As long as the employee spouse has some reasonable expectancy of receiving the benefits in the future, the nonemployee spouse's interest may attach even if the pension rights are not formally "vested." *Ibid.* Pension rights created by act of the state legislature have been treated as community property by the California courts, *Cheney* v. *City and County of San Francisco,* 7 Cal. 2d 565, 61 P. 2d 754, as have federal military pension benefits, *In re Marriage of Fithian,* 10 Cal. 3d 592, 517 P. 2d 449, and benefits afforded by the federal civil service retirement plan, *In re Marriage of Peterson,* 41 Cal. App. 3d 642, 115 Cal. Rptr. 184. The California Supreme Court in this case, having found no conflict with the express provisions or policies of the Railroad Retirement Act, applied these settled rules of state marital property law to the petitioner's expectation of receiving the retirement benefits afforded by the Act. The State's decision to treat as property benefits that arguably are not "vested" is one that it is free to make. The only question for this Court, then, is whether the State can, consistently with the federal Act, follow its normal substantive community property law in dealing with these prospective benefits.

## II

It is clear that Congress, when it established the railroad retirement system, did not purport to regulate the marital property rights of workers covered by the Act. Federal preemption, then, must be based on a perceived conflict between the provisions of the Act and the substantive law of California. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware, supra,* at 127; *New York Dept. of Social Services* v. *Dublino,* 413 U. S. 405, 423 n. 29. When the state substantive law in

question regulates family and family-property arrangements—matters that traditionally have been left to local law, see *In re Burrus,* 136 U. S. 586, 588–594; *De Sylva* v. *Ballentine,* 351 U. S. 570, 580—state interests "should be overridden by the federal courts only where clear and substantial interests of the National Government, which *cannot* be served consistently with respect for such state interests, will suffer major damage if the state law is applied." *United States* v. *Yazell,* 382 U. S., at 352 (emphasis added). The full force of this rule applies no less when the property in question consists of federally created benefits. *De Sylva* v. *Ballentine, supra,* at 580–582. Cf. *Wallis* v. *Pan American Petroleum Corp.,* 384 U. S., at 68.

Consistently with this principle, the cases that have held that a State's community property law was pre-empted have depended upon specific provisions in the federal statute governing the ownership of the property involved and, as well, upon a finding that application of the state law would substantially disserve demonstrable federal policies. *Wissner* v. *Wissner,* 338 U. S. 655; *Free* v. *Bland,* 369 U. S. 663. In *Wissner,* for example, the Court held that California could not treat the proceeds of a National Service Life Insurance policy as community property even though it assumed that the policy had been purchased with community assets. The decedent soldier in that case had, without obtaining his wife's consent, designated his mother and father as the beneficiaries under his policy. The Court's conclusion was based primarily upon a section of the National Service Life Insurance Act that specifically gave the insured the "right to designate the beneficiary or beneficiaries of the insurance" and "at all times" the "right to change" that designation. See 38 U. S. C. § 802 (g) (1946 ed.). From this explicit provision, the Court found that Congress had "spoken with force and clarity" in directing that the proceeds were to belong to the "named beneficiary and no other." 338 U. S., at 658. California's judgment awarding one-

half of the proceeds to the wife, the Court said, would nullify the choice Congress had expressly given to the soldier, *id.,* at 659, and frustrate the federal purpose of "enhanc[ing] the morale of the serviceman," *id.,* at 660. The Court also noted that the state-court judgment, insofar as it ordered the "diversion of future payments" as soon as they were paid to the beneficiary, was contrary to a provision in the Act protecting such payments from "seizure . . . either before or after receipt by the beneficiary." *Id.,* at 659.

In *Free v. Bland,* a treasury bond purchased by a husband with community assets designated the owner as husband "or" wife. Federal regulations explicitly provided that the survivor of an "or" form bond was to be the absolute owner. This directive, coupled with the substantial federal interest in establishing uniform rules governing the transfer of bonds, the Court found sufficient to override state community property law.

Essential to the finding of pre-emption in the *Wissner* and *Bland* cases was a determination that the ownership of the asset involved had, by express federal directive, been defined in a manner inconsistent with state community property law. In each case, explicit provisions of federal law not only conflicted with principles of state law but also created property rights at variance with the rights that normally would have been created by local property law.[2]

---

[2] The Court suggests that the benefits here "more closely parallel" the federal homestead land at issue in *McCune* v. *Essig,* 199 U. S. 382, than those involved in *Wissner* and *Bland. Ante,* at 582. The pre-emption principles applied in *McCune,* however, were no less rigorous than those articulated in the more recent cases. In *McCune,* a husband and wife had settled land subject to the homestead laws, and the husband had filed an appropriate claim. He died intestate before a patent was issued. Under the intestate laws of Washington, a community property State, the husband's interest would have passed to his daughter. Two provisions in the Homestead Act, however, established specific rules governing the method of completing a claim. One gave to the widow the right to fulfill the settlement terms and the entitlement to the patent. 199 U. S., at 388,

## III

In the Railroad Retirement Act of 1974 Congress did not with "force and clarity" direct that the employee's pension benefits should not be subject to the substantive community property law of California.

### A

The Railroad Retirement Act contains no express provisions governing the ownership rights that may or may not attach to the pension interest of a married employee. The provisions governing the basic annuity are in themselves neutral. Both 45 U. S. C. § 231a (a)(1), which defines the eligibility requirements for the employee's annuity, and § 231b, which contains the provisions governing the computation of annuities, state simply that the annuity is that "of the individual" employee. This indication that the benefit belongs to the employee is in this context wholly unremarkable. The congressional decision to "title" this federal benefit in the worker cannot, without more, be taken as evidence that Congress intended to disturb a body of state law that obtains whether or not the asset was earned by or is titled in one or the other spouse.

The benefit structure of the Act is also neutral. To be sure, Congress has chosen to provide a separate and additional benefit for spouses of retired workers, 45 U. S. C. § 231a (c) (3)(i), and to terminate that benefit upon divorce. 45 U. S. C. § 231d (c)(3). These provisions, however, do not preclude a rule of state property law that treats an annuity payable to either spouse as an asset of the marital community.

---

389. Another expressly provided that the fee was to "inure to the benefit of" children only if the mother and father were dead. *Id.*, at 389. Noting that "[i]t requires an exercise of ingenuity to establish uncertainty in these provisions," the Court held that Washington law could not apply to reverse the order of ownership established in the statute. *Ibid.* In *McCune*, then, no less than in *Wissner* and *Bland*, the Court based its finding of pre-emption upon federal provisions that were "express" and "clear."

The congressional decision to terminate the separate spousal benefit upon divorce in no way conflicts with that rule, for the community property interest—apart from the fact that it is an ownership interest and not a "benefit" for a divorced spouse—attaches only to that portion of an annuity attributable to labor performed *during* the marriage. And the provision of the separate and additional spousal benefit surely does not itself indicate an intent to displace community property law. The legislative history demonstrates quite clearly that Congress created this benefit in 1951 in order to respond to the greater financial needs of retired workers who are married. H. R. Rep. No. 976, 82d Cong., 1st Sess. (1951). The original Act afforded an annuity only for the individual employee. The amount of the benefit was tied to length of service and to salary, with no account taken of marital status upon retirement. See Report of the Commission on Railroad Retirement, H. R. Doc. No. 92–350, p. 7 (1972). When Congress increased the amounts available to employees with families by providing benefits for spouses, its purpose was simply to increase the level of benefits for employees with families, not to ordain the ownership of property within the family.

B

The only provision in the Act that even arguably might conflict with California community property law is § 231m, the anti-attachment provision. It states:

"Notwithstanding any other law of the United States, or of any State, territory, or the District of Columbia, no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated."

Yet this language certainly does not speak to substantive ownership interests that may or may not exist in annuities or

pension payments. Like similar language often included in spendthrift trusts, it seems to have been designed to protect the benefits from the reach of creditors. See generally E. Griswold, Spendthrift Trusts (2d ed. 1947). The provision thus has no real relevance to the question whether the annuity is the property of the marital community.[3] For under community property law, the husband and wife are not one another's creditors; they are co-owners. Upon dissolution of the marital community, the community property is divided, not adjudicated as indebtedness.

Neither the prohibition against "garnishment" nor that against "attachment" bears on an action to enforce a community property decree. Both terms govern remedies, not ownership rights, and the remedies themselves traditionally have been unavailable in an action grounded upon the theory that the property at issue "belongs" to the claimant. See generally J. Rood, Law of Garnishment (1896); S. Kneeland, Law of Attachments (1885).[4] The prohibition against "as-

---

[3] *Wissner* v. *Wissner*, 338 U. S. 655, is not to the contrary. The Court did not there hold that the anti-attachment clause in the National Service Life Insurance Act had an effect on the substantive ownership interest in the proceeds. The Court simply reasoned that Congress might have included the clause in order to protect the serviceman's unrestricted choice of beneficiary. That choice was clearly established in a different and "controlling" provision of the Act. *Id.*, at 658.

[4] The 1975 amendment to the Social Security Act permitting those to whom alimony or child-support obligations are owed to garnish federal benefits to satisfy their claims, 42 U. S. C. § 659, hardly transforms these terms of § 231m into provisions that bear on the ownership of railroad retirement benefits. Section 659 was enacted as part of a general bill designed to keep dependents of solvent but unwilling parents receiving federal benefits off the welfare rolls. S. Rep. No. 93–1356, pp. 42–43 (1974). With respect to actions for the enforcement of family-support obligations, the new provision waives the sovereign immunity of the United States and overrides contrary provisions in federal social insurance and retirement statutes. There is, however, nothing in either its language or legislative history to suggest that Congress, when it enacted § 659, intended

signment" of pension payments is equally irrelevant to the question in this case. A determination that a particular asset is community property is clearly not an "assignment" of that property from one spouse to another. It is no more than a conclusion that the property interest—from the moment it arose—belonged equally to the two parties to the marriage. Principles § 97.

It is no doubt for these reasons that the Court places no great reliance on the "garnishment," "attachment," or "assignment" provisions of § 231m. The Court does, however, discern a major conflict between the clause prohibiting "anticipation" of payments and the California community property law. Yet it seems to me demonstrably clear that this provision of § 231m is no more relevant to the issue in this case than the "garnishment," "attachment," and "assignment" provisions.

There is, as the Court acknowledges, no legislative history to explain the meaning of the "anticipation" restraint in the

to make a statement about substantive property rights that might generally affect the various federal benefit systems.

Such an intent is not to be found either in the 1977 definitional amendment to § 659, in which Congress expressly stated that "alimony" was not meant to include payments or transfers "in compliance with any community property settlement." On its face, the amendment, § 462 (c), simply states a legal truism. An alimony award is entirely distinct from a community property settlement. The only legislative history to explain the definitional amendment is the sponsor's statement that its intent was merely to clarify. 123 Cong. Rec. 12913 (1977). The Court acknowledges that before the amendment some decisions had construed the "alimony" exception to encompass community property awards. *Ante,* at 587 n. 20. One might infer, therefore, that the amendment had the limited purpose of restating the obvious in order to quell unnecessary litigation. Whatever its purpose, it is clear that § 462 (c) could not have been intended to insulate railroad retirement benefits from the reach of state community property law. Addressed as it is to a provision waiving the immunity of the Federal Government to suit, it can mean no more than that a claimant under a community property award cannot proceed directly against the United States.

Railroad Retirement Act. It can only be assumed, therefore, that Congress intended that it was to operate, as at common law,[5] to ensure that the trustees of the fund would not make or be compelled to make lump-sum payments inconsistent with the periodic benefits provided by statute. See Griswold, *supra*, § 512. Like the other terms of § 231m, its import is thus procedural, not substantive. Griswold, *supra*, § 512.

The Court suggests that the "anticipation" restraint conflicts with California community property law because state law permits a court, upon dissolution of a marriage, to consider the value of benefits that are not yet due and then to make the actual award of community property out of other assets that are currently available. The reasoning seems to be that if an employee cannot "anticipate" benefits by securing a lump-sum award, the employee's spouse is similarly prevented from "anticipating" a community property interest by receiving assets of equal value from the marital estate. This reasoning ignores the express wording of § 231m. The clause prohibits anticipation of "the payment" of a pension or annuity. A state judgment that considers the value of the pension interest acquired during marriage and satisfies that interest by ordering the transfer of other community assets does not anticipate a pension "payment." There is, accordingly, no conflict between such a judgment and § 231m, for it has no impact at all upon the timing of payments to the em-

---

[5] This type of restraint is thought to have been developed in the late 18th century as a means of protecting the separate equitable estate of a married woman. Hart, The Origin of the Restraint Upon Anticipation, 40 L. Q. Rev. 221 (1924). It prevented the trustee of her estate from making income payments before they were due or from honoring transfers by the beneficiary that would have had the effect of forcing such payments and thereby dissolving the trust established for her protection. *Ibid.* In the modern spendthrift trust, it has the similar function of preventing the trustee from making lump-sum payments in derogation of the periodic payments or time restrictions provided for in the trust instrument. See E. Griswold, Spendthrift Trusts § 512 (2d ed. 1947).

ployee and is therefore not at all incompatible with the distribution system established by Congress.

The Court also suggests that the "no anticipation" provision of § 231m was designed to preserve congressional "freedom to amend the Act." Yet it has never been established that Congress is free to terminate or reduce the benefits afforded by the railroad retirement system. Unlike the Social Security Act, see *Flemming* v. *Nestor*, 363 U. S. 603, 608–611, the Railroad Retirement Act contains no express provision permitting Congress to terminate it. Indeed, the legislative history of the Act suggests that it was established to provide security to railroad workers whose benefits under private pension programs had frequently been treated as discretionary payments. See H. R. Rep. No. 1711, 74th Cong., 1st Sess., 10–11 (1935). The drafters of the original legislation expressly stated that one of the important features of any retirement plan was a guarantee to the worker of an "absolute" right to receive the pension. *Id.*, at 11. It thus seems obvious that the "no anticipation" provision—included as it was in the 1935 version of the Act—had no relationship whatever to any possibility that Congress might try to terminate or reduce the benefits payable under the Act. Whether Congress could ever do so is an open question, a question neither presented nor properly to be decided in the present case.

Finally, the Court suggests that "anticipation" would harm an employee who leaves the industry before retirement and thus is unable to "regain" the amount of the offset. But this difficulty becomes wholly imaginary when the nature of the community property award is understood. A spouse receives only one-half the value of the pension interest attributable to work performed by the other spouse *during* the marriage. The "current connection with industry" requirement for supplemental benefits referred to by the Court obtains at the time the employee becomes eligible for current pension payments. If the employee is still working at the time the marriage is

dissolved, a California court would be obligated to give heed to the benefit provisions of the Act in appraising the value of the interest acquired by the employee's spouse during the marriage. And surely occasional problems in assessing the precise value of the community property—problems with which the courts of California routinely deal—cannot provide a basis for the Court's finding of pre-emption.[6]

## IV

The Railroad Retirement Act, unlike the statutes involved in *Wissner* v. *Wissner* and *Free* v. *Bland,* thus contains no evidence that Congress intended to withdraw the benefits at issue from the reach of California community property law. Believing, as I do, that the pre-emption perceived by the Court is entirely of its own making, I respectfully dissent.

---

[6] The Court also observes that "anticipation" of a community property interest would harm the employee to the extent that the award to the employee's spouse might exceed the lump-sum benefits payable to the employee's heirs should the employee die before collecting benefits. But survivor benefits payable under the Act are wholly distinct from the community property interest involved here.