In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1362 & 05-4075

NATIONAL LABOR RELATIONS BOARD,

*Petitioner*,

*v.*

HH3 TRUCKING, INC., GRETCHEN HUDSON, and WILLIAM HUDSON,

*Respondents*.

On Motion to Set a Remedy
for Civil Contempt of Court

ARGUED JUNE 3, 2014 — DECIDED JUNE 13, 2014

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. The National Labor Relations Board found that HH3 Trucking had committed unfair labor practices and ordered a remedy that included back pay for its workers. HH3 failed to comply, which led the Board to petition for judicial enforcement. HH3 did not reply to the petitions, so we enforced the orders summarily. *NLRB v.*

*HH3 Trucking, Inc.*, Nos. 05-1362 (7th Cir. June 1, 2005), and
05-4075 (7th Cir. Feb. 14, 2006). HH3's total financial liability
is approximately $190,000 plus interest. After HH3 ignored
our orders, the Board asked us to hold its owner-managers
(Gretchen and William Hudson) in contempt of court. We
appointed Magistrate Judge Young Kim, of the Northern
District of Illinois, to take evidence as a special master. He
found that the Hudsons could comply with the Board's or-
ders but had chosen not to do so and recommended that we
direct them to pay no less than $600 a month. We accepted
that recommendation, held the Hudsons in civil contempt,
and ordered them to pay at least $600 a month until the full
financial judgment had been satisfied.

Nothing happened. We directed the Marshals Service to
place the Hudsons in custody until they paid. That at last led
to a promise of compliance, so we released them. They paid
$600, then stopped. We put them back in jail. After they as-
serted that they are no longer able to comply, we allowed
them to be transferred to home confinement and asked
Judge Kim to hold another hearing. He concluded that, al-
though Gretchen Hudson considers herself retired and Wil-
liam Hudson has (recently) become medically unable to
work, they remain able to pay something by drawing on
savings and sources of current income that include benefits
from a retirement plan. Judge Kim recommended that we
order the Hudsons to resume paying at least $100 a month.

Represented by counsel who have volunteered their ser-
vices, the Hudsons ask us to reject this recommendation and
to find that they need not pay. They are *able* to pay some-
thing, they concede, but they maintain that they are legally
privileged not to pay. The core of this argument is the prop-

osition that money received from a pension plan covered by the Employee Retirement Income Security Act (ERISA), as their plan is, is forever free of all legal claims by third parties. Section 206(d)(1) of ERISA, 29 U.S.C. §1056(d)(1), provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." *Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365 (1990), holds that a constructive trust on benefits, under which the pension plan must pay someone other than the plan's participant, violates this rule, even when the trust would be a remedy for the participant's violation of some other part of ERISA. (Guidry, a trustee of a union-sponsored ERISA plan, embezzled some of its money; the Court held that the plan could not recoup from Guidry's personal pension account.)

Section 206(d)(1), and the Supreme Court's decision in *Guidry*, concern assets in a plan's hands. The Tenth Circuit later concluded that §206(d)(1) does not prohibit the attachment or garnishment of funds after the plan had distributed them to the retiree. *Guidry v. Sheet Metal Workers National Pension Fund*, 39 F.3d 1078, 1081–83 (10th Cir. 1994) (en banc). Judge Kim recommended that we follow the Tenth Circuit; the Hudsons ask us not to.

It is not clear that we need to choose. Anti-assignment provisions such as §206(d)(1) are concerned with legal process. We held in *Townsel v. DISH Network L.L.C.*, 668 F.3d 967 (7th Cir. 2012), that the anti-assignment rule in the Social Security Act covers only garnishment, writs of attachment, and similar devices, and does not prevent the collection of debts through other means—in *Townsel*, by use of a debit card that the retiree had linked to a checking account containing re-

tirement funds. See also *Washington State Department of Social & Health Services v. Guardianship Estate of Keffeler*, 537 U.S. 371, 383–86 (2003). The NLRB has not asked us to issue a writ of garnishment or other legal process that will divert the Hudsons' income to it automatically. Instead the Board wants an in personam judgment against the Hudsons, which would not bind either the pension plan or the Hudsons' bank. The Board does not want to *attach* pension benefits; instead it wants them taken into account when considering the Hudsons' ability to pay. The Hudsons have not cited any authority for the proposition that §206(d)(1) precludes such an assessment. But the Board makes nothing of the fact that legal process has not attached the pension funds, so we do not pursue the subject.

Five courts of appeals have agreed with the Tenth Circuit that §206(d)(1) does not prevent the attachment or garnishment of funds after a pension plan has paid them to retirees. See *Hoult v. Hoult*, 373 F.3d 47, 53–55 (1st Cir. 2004); *Central States Pension Fund v. Howell*, 227 F.3d 672, 678–79 (6th Cir. 2000); *Wright v. Riveland*, 219 F.3d 905, 919–21 (9th Cir. 2000); *Robbins v. DeBuono*, 218 F.3d 197, 203 (2d Cir. 2000); *Trucking Employees of North Jersey Welfare Fund, Inc. v. Colville*, 16 F.3d 52, 54–56 (3d Cir. 1994). One has held that §206(d)(1) shields pensions from creditors even after distribution. *United States v. Smith*, 47 F.3d 681 (4th Cir. 1995). We agree with the majority—and because we are the seventh court of appeals to reach this conclusion we can be brief.

Section 206(d)(1) says: "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." This statute deals with how pension plans administer the funds in their charge. It does not say any-

thing about what happens to the money after the plan distributes it to beneficiaries.

ERISA differs from statutes that *do* cover who can access funds after payment. For example, the Veterans Benefits Act, 38 U.S.C. §5301(a), prohibits attachment of benefits "either before or after receipt by the beneficiary." And the Social Security Act, 42 U.S.C. §407(a), provides that "none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law." Because that language covers funds "paid" as well as money "payable", the Supreme Court concluded that it applies to funds that can be traced to Social Security benefits. *Philpott v. Essex County Welfare Board*, 409 U.S. 413 (1973). Likewise 45 U.S.C. §231m(a), part of the Railroad Retirement Act and the subject of *Hisquierdo v. Hisquierdo*, 439 U.S. 572 (1979), has a broad temporal reach. The Fourth Circuit in *Smith* relied on *Hisquierdo* but missed the point that ERISA is worded differently from the Social Security Act and the Railroad Retirement Act.

Different language leads to different effects. It would stymie the process of legislation for the judiciary to announce that all clauses addressing the same general subject (such as the alienation of retirement benefits) must mean the same thing, no matter how different the statutory texts. Legislation is compromise, and not all compromises produce the same resolution even though the problem at hand seems similar. To preserve the scope of legislative choice, courts must recognize that similar problems can be resolved in different ways using different language.

> [T]his Court does not revise legislation … just because the text as written creates an apparent anomaly as to some subject it does not address. Truth be told, such anomalies often arise from statutes, if for no other reason than that Congress typically legislates by parts—addressing one thing without examining all others that might merit comparable treatment. Rejecting [an] argument that a statutory anomaly (between property and non-property taxes) made "not a whit of sense," we explained in one recent case that "Congress wrote the statute it wrote"—meaning, a statute going so far and no further. See *CSX Transportation, Inc. v. Alabama Department of Revenue*, [131 S. Ct. 1101, 1114 (2011)]. … This Court has no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view that … Congress "must have intended" something broader.

*Michigan v. Bay Mills Indian Community*, No. 12–515 (U.S. May 27, 2014), slip op. 10–11. The Hudsons make the very sort of argument that the Justices deprecated in *Bay Mills*. They insist that the goal of preserving funds for enjoyment in retirement can't be completely fulfilled unless funds are sheltered after they reach beneficiaries' hands. That may be true, but it does not follow that ERISA blocks third-party access to distributed pensions; statutes have stopping points as well as general objectives, and how far to go in pursuit of those objectives is integral to the legislative choice. See *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987).

The Supreme Court's opinion in *Guidry* makes this very point. The union contended that no sensible public policy allows an embezzler to keep the fruits of his crime by putting some or all of it into a pension plan. Guidry stole from the plan; elementary justice entitled the plan to recoup from the pot of money it held for the thief's benefit—or so the union and the plan argued. But the Supreme Court concluded that §206(d)(1) is not about elementary justice, and that it would substantially modify the text to treat it as if it read

(new language in italics): "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated *except for good reason*." Just as *Guidry* held that equitable arguments cannot contract the scope of §206(d)(1), so the Hudsons' equitable arguments cannot enlarge the statute's scope. "Congress wrote the statute it wrote" (*CSX Transportation*, 131 S. Ct. at 1114). The judiciary's job is to enforce rather than change that statute.

The Hudsons contend that pension funds are protected after distribution under state law even if not under federal law. If the Board were relying on the Federal Debt Collection Practices Act, 28 U.S.C. §§ 3001–15, that might matter to the extent that state exemptions are respected in bankruptcy, see §3014(a)(1), but this is a proceeding to remedy a contempt of court, and the Act therefore does not apply. 28 U.S.C. §3003(c)(8)(C). Civil contempt is a common-law procedure— and no state is entitled to prevent a federal court from enforcing its decrees.

All that remains is fixing the amount of the monthly payments. Although an earlier order set $600 a month as a minimum (remember that the Hudsons continue to owe the *entire* financial award, covering back pay and fringe benefits plus interest, and must satisfy it eventually), Judge Kim's most recent recommendation concluded that the Hudsons could not spare more than $100 a month after meeting their reasonable living expenses. Since that recommendation, however, the Hudsons have begun to receive Social Security benefits, which themselves exceed $600 monthly. It follows that the Hudsons now can afford at least $600 a month. Although Social Security benefits, unlike private pensions, cannot be garnished or otherwise attached after receipt, they

can be considered when determining how much a debtor can afford to pay from other sources. *United States v. Eggen*, 984 F.2d 848, 850 (7th Cir. 1993). The Hudsons' income from sources other than Social Security exceeds $600 a month, so we conclude that they must pay at least that much to purge their contempt of court. We order them to do so.

The Hudsons are scofflaws who for a decade have failed to comply with the Board's decisions, which this court has enforced. They have preferred their own comfort over the welfare of their former employees. They must understand that failure to keep up with these payments will lead to an order returning them to custody until they comply.