**METROPOLITAN LIFE INSURANCE COMPANY, a foreign corporation, Plaintiff,**

v.

**Sylvia PEARSON and Charlene Pearson, individually and as personal representative of the estate of Samuel Pearson, Jr., Deceased, Defendants.**

No. 92–CV–76916.

United States District Court, E.D. Michigan, S.D.

March 14, 1994.

Richard Patterson, Bloomfield Hills, MI, for MetLife.

George Brookover, East Lansing, MI, for Sylvia Pearson.

Joseph Garin, Thomas D. Luczak, Lipson, Nielson, Jacobs, Cole & Litt, P.C., Troy, MI, for Charlene Pearson.

## OPINION AND ORDER

FEIKENS, District Judge.

This is an interpleader action filed by Metropolitan Life Insurance Company (MetLife). MetLife is the claim administrator for the General Motors Corporation Life and Disability Plan. On June 15, 1992 a plan participant, Samuel L. Pearson, Jr., (Samuel) died. MetLife received two claims for his life insurance ·proceeds, one from Sylvia Pearson (Sylvia), Samuel's ex-wife, and one from Charlene Pearson (Charlene), Samuel's wife at the time of his death.

Under the terms of the plan, Samuel was entitled to designate a beneficiary for his life insurance proceeds using a form approved by MetLife. On June 1, 1964 Samuel designated Sylvia as his beneficiary. Sylvia and Samuel were divorced in 1971. A judgment of divorce was entered by the Wayne County (Michigan) Circuit Court on May 28, 1971. Subsequently, Samuel and Charlene were married. The life insurance plan requires affirmative action on the part of Samuel to change the·beneficiary designation. The policy states:

> The Employee may change the Beneficiary at any time by filing written notice thereof on such a form with the Employer, or the Insurance Company.

Part VI, Section B, at p. 7 of Group Insurance Certificate. Samuel never filed or attempted to file such a notice after designating Sylvia as his beneficiary in 1964. As a consequence, Sylvia remains the designated beneficiary.

Sylvia filed a counter-complaint against MetLife. She alleges that, as the designated beneficiary, she is entitled to the insurance proceeds pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. Charlene claims a right to the proceeds on behalf of the estate of her deceased husband. She believes that Michigan law and the 1971 divorce decree control. Both defendants have moved for summary judgment. Plaintiff MetLife also submitted a brief in support of Sylvia's motion. The parties agree that no questions of material fact remain to be resolved. Consequently, summary judgment is appropriate. Fed.R.Civ.P. 56(c).

### I. ERISA Preemption

Defendant Charlene Pearson relies in part on M.C.L. § 552.101, which includes the following:

> (2) Each judgment of divorce or judgment of separate maintenance shall determine all rights of the wife in and to the proceeds of any policy or contract of life insurance, endowment, or annuity upon the life of the husband in which the wife was named or designated as beneficiary, or to which the wife became entitled by assignment or change of beneficiary during the marriage or in anticipation of marriage. If

the judgment of divorce or judgment of separate maintenance does not determine the rights of the wife in and to a policy of life insurance, endowment, or annuity, the policy shall be payable to the estate of the husband or to the named beneficiary if the husband so designates. However, the company issuing the policy shall be discharged of all liability on the policy by payment of its proceeds in accordance with the terms of the policy, unless before the payment the company receives written notice, by or on behalf of the insured or the estate of the insured or 1 of the heirs of the insured, or any other person having an interest in the policy, of a claim under the policy and the divorce.

In conformance with the statutory requirement, the judgment of divorce for Samuel and Sylvia includes the following:

IT IS FURTHER ORDERED AND ADJUDGED that all rights of the plaintiff [Sylvia] in and to the proceeds of any policy or contract of life insurance, endowment, or annuity upon the life of the defendant, in which she became entitled by assignment or change of beneficiary during the marriage or in anticipation thereof, whether such contract or policy was heretofore or shall hereafter be written or become effective shall hereupon become and be payable to the estate of the defendant or such named beneficiary as he shall affirmatively designate.

Sylvia and MetLife argue that ERISA preempts both the Michigan statute and the divorce decree. ERISA "supersede[s] any and all State Laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). This is commonly referred to as the ERISA preemption provision. In *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court concluded that "the express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Id.* at 45, 107 S.Ct. at 1552 (citation omitted). However, the Court has also recognized that the preemption provision is not without limitation. "Some state

actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983).

The U.S. Court of Appeals for the Sixth Circuit relies on several factors to determine when the "remote and peripheral" exception to ERISA preemption is appropriate.

Although no single test has been formulated for determining when a state law falls within the 'remote and peripheral' exception to section 1144, several factors have been used in the analysis. First, a court may ascertain whether the state law represents a traditional exercise of state authority. *See Authier [v. Ginsberg]*, 757 F.2d [796] at 800 n. 6 [ (6th Cir.1985) ]; *Rebaldo [v. Cuomo]*, 749 F.2d [133] at 138 [ (2nd Cir.1984) ]; *Merry*, 592 F.2d at 121. Absent a clear legislative expression, "[W]e ... must presume that Congress did not intend to preempt areas of traditional state regulation." *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).

*Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 555 (6th Cir.1987). Two other factors are noted in *Firestone*.

[T]he courts are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries— than if it affects relations between one of these entities and an outside party, or between two outside parties with only an incidental effect on the plan.

*Firestone* at 556 (quoting *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises*, 793 F.2d 1456, 1467 (5th Cir.1986)). A "third factor appropriate to this analysis concerns the incidental nature of any possible effect of the state law on an ERISA plan." *Firestone* at 556. Finally, the court notes that "the factors discussed above are not exhaustive and that no single factor is dispositive." *Firestone* at 556.

In *Shaw v. Delta Airlines*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Supreme Court chose a domestic relations case

to provide an example of when preemption may be inappropriate.[1] In *American Telephone and Telegraph v. Merry,* 592 F.2d 118 (2nd Cir.1979), a divorce decree required an ex-husband to pay his ex-wife and child one half of his pension benefits. Due to his failure to pay, his ex-wife sought and obtained a state court order of garnishment against the pension fund. The U.S. Court of Appeals for the Second Circuit rejected a "strict, literal construction" of ERISA, and found an implied exception to ERISA's preemption clause.[2] *Id.* at 121. The opinion relies, in part, on "the 'fundamental principle of statutory interpretation [whereby] courts have presumed that the basic police powers of the States, particularly the regulation of domestic relations, are not superseded by federal legislation unless that was the clear and manifest purpose of Congress.'" *Id.* at 122 (quoting *Cartledge v. Miller,* 457 F.Supp. 1146, 1154 (S.D.N.Y.1978)).

The United States Supreme Court noted its traditional deference to state control of domestic relations in *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979).

> On the rare occasion when state family law has come into conflict with a federal statute, this court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be preempted. A mere conflict in words is not sufficient. State family and family-property law must do, "major damage" to "clear and substantial" federal interests before the Supremacy Clause will demand that state law be overridden.
>
> \* \* \* \* \* \*
>
> This approach must be practical.... The pertinent questions are whether the right as asserted conflicts with the express terms of federal law and whether its consequences sufficiently injure the objectives of

the federal program to require nonrecognition.

*Id.,* 439 U.S. at 581, 583, 99 S.Ct. at 808, 809 (citations omitted); see also *McCarty v. McCarty,* 453 U.S. 210, 220, 101 S.Ct. 2728, 2735, 69 L.Ed.2d 589 (1981).

█ Obviously, distribution of assets upon divorce is a traditional area of state concern. As a consequence, I must look for a clear congressional intent to preempt divorce decrees with ERISA.

Unlike the first factor mentioned in *Firestone,* the second and third factors appear to weigh in Sylvia's favor. Determination of the appropriate beneficiary undoubtedly will affect "relations among the principal ERISA entities." Furthermore, the impact of the divorce decree on the ERISA plan cannot be defined as "incidental." If not preempted, the state law will require plan administrators to look beyond the terms of their plans. Nevertheless, I note that the impact is not great. The Michigan law specifically relieves insurance companies of liability once the proceeds are paid, "unless before the payment the company receives written notice ... of a claim under the policy and the divorce." M.C.L. § 552.101(2). Furthermore, even if Sylvia wins, Metropolitan Life will be required to look beyond the terms of its insurance policies in at least some situations. This is so because life insurance is commonly purchased by individuals, as well as through employer provided plans. Michigan divorce decrees that nullify the rights of former spouses to life insurance proceeds will be enforceable when a policy is purchased by an individual, but not when supplied by an employer. *See, e.g., In re Seitz Estate,* 426 Mich. 630, 397 N.W.2d 162 (1986) (involving MetLife). The company's argument that keeping track of divorce decrees would be too burdensome seems weak when considered in this light. MetLife is required to do just that when dealing with policies issued to individuals.

---

1. *See Shaw* 463 U.S. at 100, fn. 21, 103 S.Ct. at 2901, fn. 21 ("Some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law "relates to" the plan. Cf. *American Telephone and Telegraph Co. v. Merry,* 592 F.2d 118, 121 (2nd Cir.1979) (state garnishment of a spouse's pension income to enforce alimony and support orders is not pre-empted)....").

2. The court also found an implied exception to the statute's pension anti-alienation provision, 29 U.S.C. § 1056(d)(1), discussed below.

*Hisquierdo, supra,* concluded that state community property rights cannot attach to retirement income provided pursuant to the Railroad Retirement Act of 1974, 45 U.S.C. § 231 et seq. The Court relied on the fact that the program is funded by a federal tax (much like social security), and has social welfare aspects. "Like Social Security, and unlike most private pension plans, railroad retirement benefits are not contractual." *Hisquierdo,* 439 U.S. at 575, 99 S.Ct. at 805. Moreover, Congress had deliberately rejected a proposed amendment to provide benefits for former spouses. *Id.* at 584–85, 99 S.Ct. at 809–10. If railroad retirement income were subject to community property laws, the "delicate balance" struck by Congress would be upset. "Congress has fixed an amount thought appropriate to support an employee's old age and to encourage the employee to retire. Any automatic diminution of that amount frustrates the congressional objective." *Id.* at 585, 99 S.Ct. at 810.

The Court reached a similar conclusion in *McCarty v. McCarty, supra.* There, application of state community property laws to military retirement pay was barred. Similar to the Railroad Retirement Act, military retirement pay is designed not only to provide income maintenance, "but also to ensure a 'young and vigorous' military force, to create an orderly pattern of promotion, and to serve as a recruiting and re-enlistment inducement." *McCarty,* 453 U.S. at 213, 101 S.Ct. at 2731.[3]

*Savings and Profit Sharing Fund of Sears Employees v. Gago,* 717 F.2d 1038 (7th Cir. 1983), distinguished *Hisquierdo* and *McCarty* from the facts of that case.

In contrast with *McCarty* and *Hisquierdo,* in which the Court could identify definite ⁎federal objectives for which federal funds were specifically allocated, thereby justifying rebuttal of the presumption that state domestic relations laws are preserved, the case before us does not present such strong and clearly defined federal interests.

*Gago* at 1042–43. *Gago* involved a Wisconsin court order awarding an ex-spouse a one half interest in a beneficiary's ERISA governed pension as part of a divorce property settlement. In *Hisquierdo* the Supreme Court included the following reservation:

Different consideration might well apply where Congress has remained silent on the subject of benefits for spouses, particularly when the pension program is a private one which federal law merely regulates. See Employee Retirement Income Security Act of 1974, 88 Stat. 829, 29 U.S.C. § 1001 *et seq.* Our holding intimates no view concerning the application of community property principles to benefits payable under programs that possess these distinctive characteristics.

*Id.* 439 U.S. at 590 n. 24, 99 S.Ct. at 813 n. 24. The state order in *Gago* directed the pension fund to pay one half of the pension proceeds to the former spouse. Relying on the *Hisquierdo* reservation, *A.T. & T. v. Merry, supra,* and *Shaw, supra,* the court in *Gago* concluded that ERISA preemption does not apply.

Unlike the case currently before me, *Gago* also involved interpretation of ERISA's anti-alienation provision,[4] 29 U.S.C. § 1056(d)(1), which states: "Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Congress amended the anti-alienation provision of ERISA with the Retirement Equity Act of 1984, Pub.L. No. 98–397, 98 State. 1426 (1984). The revision essentially codified the holdings of *Gago, A.T. & T. v. Merry* and similar cases [5] that had concluded that the preemption and anti-alienation provisions do

---

**3.** Congress subsequently enacted legislation to reverse *McCarty* and "to restore the law to what it was when the courts were permitted to apply State divorce laws to military retirement pay." S.Rep. No. 502, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad.News 1555, 1599; 10 U.S.C. § 1408.

**4.** The anti-alienation provision is not directly relevant to the case currently before me, because

this case involves a welfare benefit (life insurance), rather than a pension benefit plan.

**5.** *See, Bowen v. Bowen,* 715 F.2d 559 (11th Cir. 1983); *Operating Engineers' Local # 428 Pension Trust Fund v. Zamborsky,* 650 F.2d 196, 200 (9th Cir.1981); *Cody v. Riecker,* 594 F.2d 314, 317 (2nd Cir.1979).

not defeat state law domestic relations orders. The amendment was made not to change the law as it had developed in these cases, but to clarify the rules and "establish guidelines for determining whether the exception to the spendthrift rules applies." S.Rep. No. 575, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2547, 2565. The 1984 legislation requires "qualified domestic relations orders" (QDROs) to meet certain standards before the anti-alienation provision can be waived.[6]

Sylvia argues that the 1984 changes in the law indicate that ERISA preemption should be strictly applied in a domestic relations situation unless a QDRO is involved. This is contrary to the legislative history, which demonstrates that Congress was addressing a particular area of domestic relations law preemption. The QDRO provisions are designed to apply in situations in which pension benefits are attached by a state court for the benefit of a third party. The case before me differs in that the divorce decree does not require that Sylvia be maintained as a beneficiary, rather it indicates that Sylvia releases any claim she might otherwise have to Samuel's life insurance benefits.

This distinction was recognized in *Fox Valley & Vicinity Construction Workers Pension Fund v. Brown*, 897 F.2d 275 (7th Cir. 1990) (en banc). *Fox Valley* was an interpleader action brought by a pension fund against a deceased participant's former wife (Laurine) and mother (Dessie). Both claimed rights to pension death benefits. James and Laurine Brown's court approved divorce settlement included the following:

> The parties each waive any interest or claim in and to any retirement, pension, profit-sharing and/or annuity plans result-

ing from the employment of the other party.

*Id.* at 277. James, however, failed to go through the mechanics of removing his former wife as a beneficiary of his pension death benefit.

The court's analysis begins with an examination of ERISA's anti-alienation provision, 29 U.S.C. § 1056(d), and concludes that this provision does not apply for the simple reason that "James made no attempt to dispose of his interest. Instead, Laurine disclaimed any right she had to the benefits." The anti-alienation provisions "focus on the assignment or alienation of benefits by a participant, not the waiver of a right to payment of benefits made by a designated beneficiary." *Id.* at 279.

Having concluded that the anti-alienation provision and its exception do not apply, the court finds "that a proper waiver of interest by a nonparticipant in a plan is not preempted by ERISA's anti-alienation provisions...." *Id.* at 280. The court then considers whether or not Laurine effectively waived her interest in the benefits.

> ERISA is silent on the issue of what constitutes a proper waiver in this situation, and the existing body of federal common law interpreting ERISA gives little guidance on this point....

> When ERISA is silent on an issue, a federal court must fashion federal common law rules to govern ERISA suits. In making such rules, we must of course look to the statute itself for guidance, and it is also proper to turn to state law when creating such rules, as long as such state law is consistent with the policies underlying the federal statute at issue.

---

**6.** A QDRO "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan...."

[A] domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3).

*Id.* at 280–81 (citations omitted). The court concludes that only *specific* waivers of interest in benefits, such as the one Laurine signed, should be given effect. *Id.* at 281. Furthermore, the court held that "the settlement waiver is effective [only] when it becomes known to the Fund before payment." *Id.* at 282.

To counter arguments that this holding would put an onerous burden on plan administrators, the court noted that—

> No such additional burdens will be imposed because, under the ERISA statutory scheme [i.e. the anti-alienation provision], a plan administrator must investigate the marital history of a participant and determine whether any domestic relations orders exist that could affect the distribution of benefits.

*Id.* at 282.

*McMillan v. Parrott,* 913 F.2d 310 (6th Cir.1990), addressed a similar issue. That case involved a dispute over the appropriate distribution of proceeds from two vested ERISA governed trusts. As in the case before me, the decedent Norman Parrott designated his first wife, Barbara, as beneficiary in the event of his death. Norman and Barbara were divorced in 1982. The divorce decree included the following:

> *Full Release* Each party hereby waives, relinquishes and forever releases the other party of any and all claims he or she may have against the other for dower, curtesy, alimony, maintenance, property settlement, and all other claims of any kind and nature, except as herein provided; ...
>
> *   *   *   *   *   *
>
> The Respondent [Norman] shall be awarded all of the remaining marital property and non-marital property of the parties....

*Id.* at 312. Although this language is similar in some respects to the divorce judgment of Samuel and Sylvia Pearson, it lacks the spec-

ificity found in that order as well as the order discussed in *Fox Valley.*

Four years later, in 1986, Norman married Claudia, and proceeded to die within 24 hours. He never changed the designation of Barbara as trust beneficiary. In spite of the divorce decree, the U.S. Court of Appeals for the Sixth Circuit concluded that Barbara was the appropriate beneficiary, and ruled in her favor.

The court concluded that the plan documents must control. The plan required a change in beneficiary to be made by the plan participant in a writing directed to the plan administrator. Norman Parrott failed to do this.

> ERISA requires that a plan administrator discharge his duties "in accordance with the documents and instruments governing the plan...." 29 U.S.C. § 1104(a)(1)(D) (1985).... The designation of beneficiary under the plans named Barbara Parrott as Dr. Parrott's beneficiary, and continued to do so, unchanged, for four years after their divorce. This clear statutory command, together with the plan provisions, answer the question; the documents control, and those name Barbara Parrott.

*Id.* at 311–12. The opinion dismisses arguments concerning Barbara's intent, concluding "it was Dr. Parrott's designation which controls, not Barbara's intent. Under the plans, we determine his intent by the designation on file at the time of his death." *Id.* at 312.[7] The opinion notes the efficiency of such an approach:

> If the designation on file controls, administrators and courts need look no further than the plan documents to determine the beneficiary, thus avoiding expensive litigation as has occurred in the case before us.

*Id.* at 312.

*McMillan* appears to reject the possibility of deciding the question of an appropriate beneficiary based on anything other than the terms of the plan itself. Nevertheless, the

---

**7.** *McMillan* includes the following footnote:

In *Fox Valley,* 897 F.2d at 279–80, the court held that the anti-alienation provision in ERISA, 29 U.S.C. § 1056(d), does not prohibit the alienation, assignment, or waiver of interest by a beneficiary, such as Barbara. The

minority held the contrary. *See id.* at 283. We need not decide this issue because we herein hold that the interest of Barbara Parrott is controlled by the plan documents as they provided at the time of Dr. Parrott's death. *Id.* at 312, fn. 1.

court notes and rejects an argument based on waiver by Barbara:

> Even if we were to resolve this question by reference to federal common law, we believe that Barbara Parrott's waiver would not be effective here. The only cases which have applied such law have required that, to be effective, the waiver must specifically refer to the spouse's rights as beneficiary in an ERISA plan. *See Fox Valley,* 897 F.2d 275, 278 (7th Cir.1990) (en banc); *Lyman Lumber [v. Hill],* 877 F.2d 692, 693 (8th Cir.1989).

*McMillan* at 312. Because the divorce decree did not contain a specific waiver, the plan document controlled.[8]

Several cases from Michigan courts have simply assumed, without comment, that Michigan law controls. *In re Seitz Estate,* 426 Mich. 630, 397 N.W.2d 162 (1986), involved a dispute between the first and second wives of Seitz over the proceeds of his life insurance. The insurance was provided to Seitz through his employer by MetLife. Seitz named his first wife, Loretta, as beneficiary at a time when they were still married. He failed to change the beneficiary designation, even after his second marriage. Nevertheless, the court assumes without discussion that "[b]y statute, the divorce judgment terminated all rights Loretta may have had in the proceeds of any life insurance policy on Leroy in which she was a named beneficiary." *Id.* at 633, 397 N.W.2d 162. Likewise, in *Metropolitan Life Ins. Co. v. Church,* 150 Mich.App. 539, 389 N.W.2d 124 (1986), the Michigan Court of Appeals concluded that a divorce decree and the Michigan statute control, denying insurance proceeds to a divorced first wife designated as the life insurance beneficiary. *See, also, Holley v.*

*Schneider,* 422 Mich. 248, 369 N.W.2d 857 (1985).

I find that Congress did not intend to preempt this traditional area of state control, at least in so far as life insurance is concerned. Enforcement of the divorce decree will impose only a slight burden on plan administrators and will protect the legitimate expectations of plan participants and beneficiaries.

## II. *Pre–1975 Act or Omission*

■ Even if I had concluded otherwise, another reason exists for denying ERISA preemption. The preemption provision contains the following reservation:

> This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

29 U.S.C. § 1144(b)(1). This reservation was discussed in *Stevens v. Employer–Teamsters Joint Council No. 84 Pension Fund,* 979 F.2d 444 (6th Cir.1992). Stevens worked as a truck driver from 1958 until 1979. Upon his retirement he applied for and was denied pension benefits. Although a union contract required it to do so, his employer failed to make contributions to the pension fund on Stevens' behalf from 1961 until 1966. This failure resulted in denial of benefits.

Stevens filed a claim against the pension fund pursuant to the civil enforcement provision of ERISA, 29 U.S.C. § 1132, in federal court. The U.S. Court of Appeals for the Sixth Circuit ordered his claim dismissed, because it fell within the ERISA preemption limitations clause (quoted above). In other words, the employer's failure to contribute to the pension fund was a pre–1975 act or omission. Neither the fund nor the employer could be held responsible pursuant to

8. In a recent Sixth Circuit opinion, *Moore v. Philip Morris Companies, Inc.,* 8 F.3d 335 (6th Cir.1993), the court concluded that a Kentucky statute that divests unfaithful spouses of any rights to death benefits of their partners is preempted by the Retirement Equity Act of 1984, Pub.L. 98–397, 98 Stat. 1426 ("REACT"). That Act modified ERISA "by requiring plans, such as Philip Morris' deferred profit sharing plan, to provide that the surviving spouse of a participant is to receive the benefits under the plan following the death of the participant, unless such benefits are specifically waived by the surviving spouse in a manner prescribed by law...." *Moore* at 338. The decedent's husband was entitled to the benefits even though he allegedly had left his wife for another woman, and his wife had designated her children as beneficiaries. This case can be distinguished from the case before me because it involves a specific determination by Congress that one spouse should have rights to the other spouse's pension benefits that cannot be taken away without his or her consent. In other words, in this particular context, Congress specifically chose to delve into the area of domestic relations.

ERISA, although they might be liable under other laws.

The court in *Stevens* recognized that "the two clauses of section 1144(b)(1) should be read disjunctively."

"The application of ERISA thus depends upon: 1) a determination of the time the cause of action arose, and 2) a determination of the time of acts or omissions." *Rodriguez v. MEBA Pension Trust*, 872 F.2d 69, 71 (4th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989) (citing cases). Therefore, under section 1144(b)(1), if either "the cause of action arose" or relevant "acts of omissions" on which a pension fund based a post-1975 benefits decision occurred before January 1, 1975, then ERISA does not apply.

*Stevens* at 450–51.

The first prong of the § 1144(b)(1) test—when the cause of action arose—is not at issue in this case. Neither Sylvia nor Charlene could have a claim for life insurance benefits before Samuel's death on June 15, 1992.

Under the second prong, courts must determine what conduct amounts to "any act or omission" so that ERISA does not apply to disputes related to that conduct.... Congress has given courts little guidance as to what the phrase "any act or omission" refers, and the result is the development among the circuits of two competing views on this issue.

    \*    \*    \*    \*·    \*    \*

After carefully considering the opposing positions, we hold that if the operative events on which a pension plan bases a benefit decision occurred before January 1, 1975, there is no ERISA preemption and, consequently, no ERISA jurisdiction. ERISA jurisdiction will not lie in cases where a pension plan denies the applicant's claim after January 1, 1975, but the plan administrators exercised no discretion in so denying because the ultimate benefit decision was completely dictated by the pre-1975 events.

*Id.* at 451, 452.

Charlene argues that the operative events in this case—the designation of Sylvia as beneficiary and the divorce judgment—all occurred before 1975. Certainly, at the time of his divorce in 1971 Samuel could not have anticipated ERISA. Michigan law allowed him to rely on his divorce decree to determine his ex-wife's interests in his life insurance proceeds. His failure to change the beneficiary designation arguably was due to this reliance. Indeed, if he had died after the divorce, but before January 1, 1975, there would be no question that his estate is the appropriate beneficiary. Mere passage of ERISA should not change that result.

Sylvia argues that we have no way of knowing what Samuel's thoughts and intentions were at the time of their divorce. He might have purposely failed to change the beneficiary due to a sense of obligation to his former wife. Although this is possible, it seems much less likely. Moreover, the Michigan statute provides at least two mechanisms for retaining a former spouse as a beneficiary, neither of which Samuel pursued. First, he could have agreed to a divorce decree that would have allowed Sylvia to retain life insurance benefits. The statute does not require that ex-spouses be denied benefits. It merely directs the parties to resolve this issue within their divorce decree. In addition, the statute does not prevent a former husband from affirmatively redesignating his former wife as a beneficiary after the divorce. Because Samuel failed to take either of these actions, the natural inference is that he did not intend to retain his ex-wife as a beneficiary of his life insurance. At the time he made this decision, he could rely on Michigan law to insure that his intent would be enforced. Likewise, in *Stevens*, the employer's failure to pay pension contributions as required by a collective bargaining agreement, and the pension fund's failure to collect contributions and/or inform Stevens of his employer's failure to pay were acts or omissions that occurred before 1975. Consequently, ERISA does not apply.

Sylvia argues that only pre-1975 operative events attributable to either an employer or plan fiduciary are subject to the § 1144(b)(1) preemption exception. Here, a plan participant (Samuel), rather than a fiduciary or employer, is the key actor. Sylvia is unable

to point to any cases that make this distinction. She relies on the fact that every major case dealing with interpretation of § 1144(b)(1) has involved alleged acts or omissions committed by plan fiduciaries or employers before 1975. In other words, the provision has been used in the past, perhaps exclusively, as a defense by plan administrators to suits brought by beneficiaries, most often pension plan beneficiaries. In this case, a potential beneficiary hopes to use the provision as a sword against the plan administrator.

Nothing in the statutory language supports Sylvia's interpretation of § 1144(b)(1). By its terms, the provision applies to all relevant pre–1975 acts or omissions no matter who is responsible for them. The court in *Stevens* recognized a "clear congressional intent that ERISA *not* be retroactively applied." *Id.* at 452. Much of the language of *Stevens* is directed to the factual situation in that case. For example, the court stated:

> By holding that ERISA does not apply to denials of benefits based on pre–1975 events, we protect plan fiduciaries—potential defendants—from "retroactive application of remedial principles not in effect at the time of the conduct in question."

*Id.* at 453 (citation omitted). This language reflects the court's concern for protection of plan fiduciaries. ERISA's primary function, however, is protection of plan participants and beneficiaries. *See* 29 U.S.C. § 1001; *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). There is no reason to assume that the court in *Stevens* would reach a different conclusion in a case such as the one currently before me.

In conclusion, Sylvia's Motion for Summary Judgment is denied and Charlene's is granted. Samuel's life insurance proceeds should be distributed to his estate.

### III. *Attorney Fees and Sanctions*

Both Charlene and Sylvia seek attorney fees and/or sanctions pursuant to Fed. R.Civ.P. 11. Considering the closeness of the issues involved in this case, I find that application of Rule 11 is unwarranted and deny these requests.

IT IS SO ORDERED.