697 So.2d 1061 (1997)
Martha W. HYDE
v.
Thomas M. HYDE.
No. 96 CA 1725.
Court of Appeal of Louisiana, First Circuit.
June 26, 1997.
*1062 Steven K. Faulkner, Jr., Metairie, for Defendant/Appellant, Thomas M. Hyde.
Harry P. Pastuszek, Jr., Mandeville, for Plaintiff/Appellee, Martha W. Hyde.
Before CARTER, LeBLANC and PARRO, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment, classifying certain disability benefits as community property.

BACKGROUND
Martha and Thomas Hyde were married on August 5, 1970.[1] During their marriage, the Hydes acquired movable and immovable property, which was community property. The Hydes physically separated on November 5, 1992. On that date, Mrs. Hyde filed a petition for divorce, and the parties were divorced by judgment rendered on June 17, 1993.

FACTS
In November of 1972, Mr. Hyde began working for Exxon Corporation (Exxon). During his employment, Mr. Hyde was diagnosed as a diabetic. Mr. Hyde's diabetes became progressively worse. In September 1990, Mr. Hyde developed diabetic ulcers and staph infections and began to encounter circulatory problems and difficulties with the bone structure in his feet. In 1992, one of Mr. Hyde's feet was amputated. Mr. Hyde's physical condition continued to deteriorate. On December 1, 1992, as a result of his physical condition, Mr. Hyde began receiving monthly disability benefits of $2,475.00 from Exxon.
On April 19, 1993, Mrs. Hyde filed a suit to partition the property belonging to the community of acquets and gains formerly existing between her and Mr. Hyde. A partial community property settlement was reached by the parties. The only asset not amicably partitioned was Mr. Hyde's entitlement to monthly disability benefits from Exxon. Mr. Hyde contended that the disability benefits were his separate property. Mrs. Hyde contended that the disability benefits represented deferred compensation in the form of early retirement benefits, which would be community property.
A hearing was held on the classification of the monthly disability benefits Mr. Hyde receives from Exxon. The trial court first held that, until Mr. Hyde reached the age of sixty-five (65) years, the monthly disability benefits were his separate property. Thereafter, the benefits to be received by Mr. Hyde are retirement benefits, which are community property. After Mr. Hyde reaches age sixty-five (65), Mrs. Hyde's interest in his retirement benefits would be calculated under the formula enunciated in Sims v. Sims, 358 So.2d 919 (La.1978), providing Mrs. Hyde with a 49.82% interest in Mr. Hyde's retirement benefits.
Thereafter, Mr. Hyde filed a motion for *1063 partial new trial.[2] On March 28, 1996, the trial court rendered judgment, determining that the monetary benefits Mr. Hyde receives from Exxon are assets of the former community of acquets and gains and that the disability benefits paid under the Exxon plan, beginning December 1, 1992, are to be apportioned pursuant to the Sims formula, such that Mrs. Hyde is entitled to 49.83% of such benefits. Accordingly, the trial court ordered that Mr. Hyde pay Mrs. Hyde $50,564.89, representing the disability benefits Mr. Hyde received from December 1, 1992, through April 1996, together with interest.
From this adverse judgment, Mr. Hyde appealed, assigning the following errors:
1. The district court erred in determining that Mr. Hyde's disability benefits are community property and awarding half the benefits to Mrs. Hyde.
2. The district court erred in basing its decision on the erroneous finding that fifteen years of service were required before Mr. Hyde was entitled to disability benefits.

CLASSIFICATION OF DISABILITY BENEFITS
The classification of disability payments requires a careful examination of all pertinent facts to determine if such payments are deferred compensation in the nature of retirement or pension income under T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975). If the payments represent deferred compensation, they are classified as community property to the extent attributable to the years of service performed during the existence of the community under Sims v. Sims, 358 So.2d 919.
The jurisprudence has addressed the classification of disability benefits on numerous occasions. See Mercer v. Mercer, 95-1257 (La.App.3d Cir. 4/3/96); 671 So.2d 937; Brant v. Brant, 26,508 (La.App. 2nd Cir. 1/25/95); 649 So.2d 111; Arnaud v. United Brotherhood of Carpenters and Joiners of America, 577 So.2d 184 (La.App. 1st Cir.), writ not considered, 580 So.2d 369 (La.1991); Johnson v. Johnson, 532 So.2d 503 (La.App. 1st Cir.1988); and Lachney v. Lachney, 529 So.2d 59 (La.App. 3rd Cir.), writ denied, 532 So.2d 764 (La.1988).
In Lachney v. Lachney, 529 So.2d at 66-68, our brethren of the Third Circuit Court of Appeal considered a disability insurance policy available through the employee-spouse's employer. The employee spouse had not paid for the disability insurance coverage. The disability policy had no cash surrender value. Further, if the employee reached the age of sixty-five (65) without suffering a disability, the employee would never receive any benefits under the policy. The court held that the disability payments made under the policy were not deferred compensation, but were in the nature of tort damage awards and worker's compensation benefits. Accordingly, the court determined that the employee's spouse had no interest in the employee's monthly disability benefits received after dissolution of the community. More recently, the Third Circuit Court of Appeal was presented with another opportunity to determine the appropriate classification of disability benefits. In Mercer v. Mercer, 671 So.2d at 939-40, the court held that disability payments under a policy purchased with community funds were the separate property of the claimant spouse. The court reasoned that the disability policy had no cash surrender value, required periodic medical examinations for continuation of the benefits, and provided for termination of the disability benefits upon the claimant's death or the attainment of the age of sixty-five (65). The court determined that the disability payments made pursuant to the policy were substitutions for wage losses and did not constitute deferred compensation in the nature of retirement or pension income to which his spouse had a legally recognizable claim.
In Brant v. Brant, 649 So.2d at 113-14, our brethren of the Second Circuit Court of Appeal determined that disability payments, which represented compensation a claimant would have earned if not for his illness, were not deferred income and required classification *1064 of those benefits in accordance with the approach used by the courts in allocating tort damage awards and worker's compensation benefits.
This court has considered the issue of the classification of disability benefits also in Arnaud v. United Brotherhood of Carpenters and Joiners of America, 577 So.2d 184 and Johnson v. Johnson, 532 So.2d 503. In Arnaud v. United Brotherhood of Carpenters and Joiners of America, 577 So.2d at 185-86, this court held that disability benefits did not represent deferred compensation. The court noted that the disability portion of the benefits plan had no cash value. The court also noted that if the employee reached age sixty-five (65) without suffering a disability, he would receive no benefit under the plan. Moreover, if the employee returned to work, his monthly benefit would be terminated and his disability pension would be voided. Considering these facts, the court determined that the disability benefits, which constituted post-community loss of earnings, were the employee's separate property. In Johnson v. Johnson, 532 So.2d at 505, this court held that disability benefits received by an employee spouse pursuant to LSA-R.S. 33:2113.1[3] were community assets. The disability benefits were paid from a fund comprised, in part, of employee contributions. The disability payment to which the employee was entitled was a percentage of the employee's average compensation. The actual percentage was based on the number of years of service of the injured firefighter. Upon retirement, the accumulated contributions of an employee, together with an amount taken from the pension account, were placed in a reserve account for the payment of future retirement benefits. Considering these facts, this court determined that the disability benefits were community property. The court explained that the firefighter's right to receive compensation for his disability was based entirely on that firefighter's contributions to the fund from community earnings and his years of service as a firefighter.
Therefore, we must examine the particular facts regarding the Exxon disability plan to determine whether the disability benefits paid to Mr. Hyde after the termination of the community were community assets or whether these benefits constituted his separate property.
In the instant case, it is undisputed that Mr. Hyde did not make any contributions to the disability plan. The testimony established that Exxon's disability plan is funded from contributions made by Exxon.
Mark Deroen, a certified public accountant, testified that Exxon's disability plan, which paid Mr. Hyde's disability benefits, was funded directly by Exxon. Deroen explained that in December 1992, Mr. Hyde began receiving $2,475.00 per month, which was funded only from contributions by Exxon under the disability plan. According to Deroen, after Mr. Hyde reaches sixty-two (62) years of age, his monthly payment and the source of the funding of his monthly benefit will change. After Mr. Hyde turns sixty-two (62) years of age, his monthly benefit will increase to $2,498.00 and will be funded in part by Social Security and in part by Exxon's disability plan. After Mr. Hyde reaches sixty-five (65) years of age, his monthly benefit will be funded by Social Security, an annuity purchased by Exxon through Aetna Insurance Company, and the Exxon disability plan.
Kathy Parent, annuity plan accounting supervisor with Exxon, testified that at the time of his disability, Mr. Hyde had twenty (20) years, one (1) month of benefits plan service. Parent noted that Hyde receives disability retirement benefits from Exxon. His monthly benefit totals $2,475.00, which is based upon 50% of his annual earnings ($59,400.00) at the time of his disability. Parent noted that Mr. Hyde's disability benefits would terminate if he died or if he were able to return to work.
Parent also testified relative to the source of the funding for the disability plan. According *1065 to Parent, initially an employee's disability benefits are funded totally by Exxon. After an employee reaches age sixty-two (62), the source of the benefits changes in that there is an offset or reduction for Social Security. In Mr. Hyde's case, his monthly benefit of $2,475.00 will remain unchanged; however, some of the funds for that monthly benefit will come from Social Security and the remainder will come from Exxon's disability fund.
Parent further explained that, after Mr. Hyde reaches age sixty-five (65), which is the normal retirement age, his monthly retirement benefit will be based upon his years of service of twenty (20) years. The formula for calculating his retirement benefit will be 1.6 times the highest average recognized compensation for the highest three of the last ten years of service. From this sum, there will be a deduction for Social Security benefits equal to 1.5 times the Social Security benefit. The funding for the retirement benefit after age sixty-five (65) will be from an annuity trust, from Aetna's guaranteed part, and from the disability fund.
Parent itemized the contributions from the disability fund over the course of Mr. Hyde's payments as follows:
$2,475.00 from December 1, 1992 until 2011 (age 62);
$1,619.00 from December 1, 2011 until 2014 (age 65);
$356.85 after December 1, 2014.
Lea Conner, benefit counsel with Exxon, also testified relative to Mr. Hyde's disability benefits. Conner explained that Exxon's disability plan is a welfare benefit plan as opposed to a retirement plan. The disability plan is not part of Exxon's compensation structure and the benefits Mr. Hyde receives pursuant to the disability plan are not part of the pension plan. According to Conner, after employment for one (1) year, all Exxon employees are entitled to long-term disability benefits if they become disabled. Conner noted that the amount of the disability benefit is not based on years of service, but on the salary level of the particular employee at the time of his disability.
A review of the entire record in the matter leads us to the conclusion that the disability benefits received by Mr. Hyde from December 1, 1992, until Mr. Hyde reaches age sixty-five (65) are not deferred compensation and are not in the nature of retirement benefits. The trial court's contrary conclusion is legal error. Mr. Hyde did not make any contribution to the disability plan whatsoever. If Mr. Hyde had continued to work for Exxon without suffering from a disabling condition, he would not have been entitled to receive any disability benefits. If Mr. Hyde is able to return to work, his monthly disability benefits will be discontinued. Further, at retirement age (65 years old), Mr. Hyde will receive unreduced retirement benefits, a proportionate interest of which will belong to Mrs. Hyde.
Additionally, we find that the facts regarding the disability plan in Johnson v. Johnson, 532 So.2d 503, are clearly distinguishable from the facts relative to Exxon's disability plan in the instant case. In Johnson, the employee spouse's right to receive disability benefits was based upon his contributions to the disability fund, which were made from community funds, and were calculated on the basis of his number of years of service which occurred during the existence of the community. The disability benefits flowed from a community endeavor. In the instant case, there were no employee contributions, and after only one year of employment, an employee became eligible for disability benefits. The amount of the disability benefit was not based upon the number of years of service, but was equal to 50% of the employee's earnings on the date of the disability, regardless of the number of years of service. Moreover, in this case, there was no cash value in the plan; if the employee did not suffer a disability, he was not entitled to receive any funds from the disability plan. As such, the benefits in this case are clearly not in the nature of deferred compensation.
Therefore, we find that the disability benefits received by Mr. Hyde as a result of his disability are more representative of compensation for lost earnings due to an inability to work and, as such, are his separate property.

*1066 CONCLUSION

For the above reasons, the judgment of the trial court is reversed insofar as it classified Mr. Hyde's disability benefits from December 1, 1992, to age sixty-five (65) as community property. The trial court judgment is also reversed insofar as it ordered Mr. Hyde to pay Mrs. Hyde $50,564.89, together with interest. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed against Mrs. Hyde.
AFFIRMED IN PART AND REVERSED IN PART.
NOTES
[1] We note that there was some discrepancy regarding the date the parties were married. In various pleadings and orders, it was asserted that the parties were married on August 5, 1970. To the contrary, at a hearing, Mrs. Hyde testified that she married Mr. Hyde on August 14, 1974. However, in her brief to this court, Mrs. Hyde stated that she was married to Mr. Hyde for 22 years, which would mean the parties were married in 1970. The first time that Mr. Hyde asserted that the date of the marriage was August 14, 1974, was in his appellate brief. The trial court concluded the date of the marriage was August 5, 1970. Neither appellant nor appellee raised or briefed this discrepancy as an issue on appeal. Therefore, this issue is not properly before us. See Uniform Rules-Courts of Appeal, Rule 2-12.4.
[2] Mrs. Hyde filed a memorandum in support of a motion for new trial on January 2, 1996. However, the record does not contain a motion for new trial filed on behalf of Mrs. Hyde.
[3] LSA-R.S. 33:2101 et seq., now LSA-R.S. 11:3361 et seq., created the Firefighters' Pension and Relief Fund, which was funded by salary deductions of fire department employees, license fees from the City of New Orleans, and by forfeitures, fees, fines, gifts, and proceeds from sales of condemned property.