727 So.2d 622 (1998)
Wanda Slaven LEE
v.
Milford (NMI) LEE.
No. 98 CA 0031.
Court of Appeal of Louisiana, First Circuit.
December 28, 1998.
*623 Michael R. Hubbell, Baton Rouge, Counsel for Plaintiff/Appellee Wanda Slaven Lee.
Milford Lee, Baton Rouge, Defendant/Appellant In Proper Person.
BEFORE: GONZALES, KUHN, AND WEIMER, JJ.
KUHN, Judge.
This is an appeal from a trial court judgment which ordered defendant-appellant, Milford (NMI) Lee, to pay a sum in cash to plaintiff-appellee, Wanda Slaven Lee, as an *624 equalizing payment following the division of community property and classified certain disability benefits received by Mrs. Lee as her separate property. We affirm.

FACTS AND PROCEDURAL BACKGROUND
During September of 1994, Mrs. Lee filed a petition seeking the partition of numerous items of property which the Lees acquired during their marriage. According to the allegations of the petition, Mr. and Mrs. Lee were married on September 26, 1959, and were divorced by judgment dated November 20, 1991. By the time of the trial, July 10, 1996, the Lees had resolved most of the property settlement issues but continued to dispute whether Illinois Central Railroad Retirement Tier II disability annuity payments received by Mrs. Lee were to be classified as community or separate property. Notwithstanding the classification of the disability annuity payments, the Lees agreed to a division of their community assets. The value of the assets partitioned to Mr. Lee were assigned a greater value than the assets partitioned to Mrs. Lee. Although the parties did not dispute that some type of equalizing payment from Mr. Lee to Mrs. Lee would be required, they could not agree on the specific terms of this payment. The parties disputed whether Mr. Lee should be required to sell an appropriate number of shares of stock allocated to him in the property settlement or whether Mrs. Lee should be paid out of Mr. Lee's share of the proceeds from the liquidation of a used car business owned by the community.[1] Accordingly, the issue of how the equalizing payment would be made was also presented to the court.
The parties stipulated that the Illinois Central Railroad Retirement Tier I disability annuity,[2] currently being paid to Mrs. Lee, and the Tier I retirement annuity payments which will become payable to Mrs. Lee when she reaches retirement age, are the separate property of Mrs. Lee. The parties also stipulated that the Tier II disability annuity payments which will become payable to Mrs. Lee when she reaches retirement age pursuant to the Railroad Retirement Act, 45 U.S.C. § 231 et seq., shall be divided pursuant to a Qualified Domestic Relations Order, based on Sims v. Sims, 358 So.2d 919 (La.1978), and pursuant to the terms of the Railroad Retirement Act. The parties reserved their rights to contest whether the Tier II disability annuity payments (paid to Mrs. Lee from the date of the first disability annuity payment made to Mrs. Lee by the Railroad Retirement Board until the date she reaches retirement age under the Railroad Retirement Act) are the separate property of Mrs. Lee or are divisible under state community property law.
In written reasons for judgment, dated October 1, 1996, the trial court considered whether the Tier II monthly benefit of $506.80 that Mrs. Lee was receiving represented deferred compensation in the nature of retirement (or pension) income or compensation paid to an injured employee for lost earnings in the event the employee becomes incapacitated due to serious illness or injury. The trial court found that Mrs. Lee, at 57 years of age, was not eligible for retirement or early retirement under the Railroad Retirement Act, and that Mrs. Lee would not be receiving either Tier I or Tier II annuity benefits if she were not disabled. The trial court determined that Mrs. Lee became disabled after the community was terminated on October 2, 1991, and that Mrs. Lee began receiving the disability annuity during 1994. In classifying the disability annuity as Mrs. Lee's separate property, the court noted that Mrs. Lee is required to prove her disability periodically and, if she becomes capable of working, she would no longer receive the disability annuity. The court determined that the annuity was a substitute for lost income attributable to Mrs. Lee's disability and that the annuity should not be treated as a deferred compensation plan. With respect *625 to the issue regarding the equalization of the division of the community property, the court ordered Mr. Lee to pay $33,326.69 in cash to Mrs. Lee within forty-five days of the signing of the judgment.[3] In accordance with the parties' stipulations and the written reasons for judgment, a judgment was signed on December 3, 1996.[4]
Mr. Lee appeals urging the trial court: 1) erred in determining that the Tier II disability annuity benefits were Mrs. Lee's separate property and 2) abused its discretion in a) ordering Mr. Lee to pay $33,326.69 in cash within such a short period of time and b) excluding testimony establishing that an equalizing payment could have resulted from the sale of certain motor vehicles.

CLASSIFICATION OF THE TIER II DISABILITY ANNUITY BENEFITS
Mr. Lee asserts the Tier II disability benefits are received by Mrs. Lee from her employer, Illinois Central Railroad, as a result of her years of service, and, as such, the benefits should be classified as community property.[5]
Retirement annuities for railroad workers are governed by the Railroad Retirement Act of 1974, 45 U.S.C. §§ 231 et seq. The money for the payment of these annuities is kept in the Railroad Retirement Account maintained in the United States Treasury. 45 U.S.C. § 231n. This account is funded primarily via the Railroad Retirement Tax Act, 26 U.S.C. §§ 3201 et seq. Railroad employers and employees are required to pay Tier I and Tier II taxes, which are calculated as a percentage of employee compensation, to the Internal Revenue Service. 26 U.S.C. §§ 3201 and 3221. In addition to the taxes paid by and on behalf of the railroad employees, the Railroad Retirement Account has been funded in part by the social security system and general tax revenues. Hisquierdo v. Hisquierdo, 439 U.S. 572, 574-575, 99 S.Ct. 802, 804-805, 59 L.Ed.2d 1 (1979).
The Railroad Retirement Act resembles both a private pension program and a social welfare plan, providing two tiers of benefits. The Tier II level of benefits functions like a private pension with benefits being tied to earnings and career service. In order to be eligible, an employee must work in the railroad industry for ten years. Absent disability, no benefit is paid until the employee: 1) reaches "retirement age" (65 to 67 years of age depending on the date the individual attains early retirement age) as defined by the Social Security Act, 42 U.S.C. § 416(1); or 2) is at least 60 years old and has completed 30 years of service; or 3) is at least 62 years old if less than 30 years of service has been completed, with the employee being eligible for reduced retirement benefits. 45 *626 U.S.C. § 231a(a)(1). As in a social welfare or insurance scheme, the taxes paid by and on behalf of an employee do not necessarily correlate with the benefits to which the employee may be entitled. Hisquierdo v. Hisquierdo, 439 U.S. at 574-575, 99 S.Ct. at 805.
The larger tier of benefits, the Tier I benefits, are equivalent to those the employee would receive if covered by the Social Security Act, 42 U.S.C. § 301 et seq. See 45 U.S.C. § 231a(a)(1) and § 231b(a)(1). Like social security benefits, and unlike most private pension plans, the railroad retirement benefits are not contractual. Congress may alter or even eliminate them at any time. Hisquierdo v. Hisquierdo, 439 U.S. at 575, 99 S.Ct. at 805. Accordingly, the benefits which an eligible "individual" receives under the Act do not result from "contributions" which have a "value" as may be the case with a privately financed pension plan.
Section 231m of Title 45 of the United States Code, the anti-attachment clause of the Railroad Retirement Act, provides, in pertinent part, that "no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated." (Emphasis added.) In Hisquierdo, the United States Supreme Court interpreted this provision and held that California community property law was preempted with respect to the classification of benefits received under the Railroad Retirement Act. The Court found that section 231m demonstrated the Congressional intent to preclude claims based on marital and family obligations as well as those of ordinary creditors. The Court concluded that the anti-attachment provision "ensures that the benefits actually reach the beneficiary." Hisquierdo, 439 U.S. at 583-584, 99 S.Ct. at 809. In response to Hisquierdo, Congress amended section 231m pursuant to the Railroad Retirement Solvency Act of 1983. As amended, section 231m(2) provides, in pertinent part:
This section shall not operate to prohibit the characterization or treatment of that portion of an annuity under this subchapter which is not computed under section 231b(a), 231c(a), or 231c(f) of this title, or any portion of a supplemental annuity under this subchapter, as community property for the purposes of, or property subject to, distribution in accordance with a court decree of divorce ... or the terms of any court-approved property settlement incident to any such court decree. The Board shall make payments of such portions in accordance with any such characterization or treatment or any such decree or settlement.
This amendment has been interpreted as expressly permitting the characterization of supplemental annuity (Tier II) benefits as community property subject to distribution upon a divorce. See McGraw v. McGraw, 186 W.Va. 113, 115, 411 S.E.2d 256, 258 (W.Va.1991).
In the present case, Mrs. Lee's Tier II disability annuity benefits are being paid pursuant to 45 U.S.C. §§ 231a(a)(1) and 231b(b). Accordingly, since the Tier II disability benefits currently being received by Mrs. Lee are not being calculated under section 231b(a), 231c(a), or 231c(f) of the Act, we conclude that section 231m does not prohibit the benefits from being classified pursuant to Louisiana's community property law.
In order to classify disability payments, a careful examination of all pertinent facts must be made to ascertain whether the payments are deferred compensation in the nature of retirement or pension income under T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1975). If the payments represent deferred compensation, they are classified as community property to the extent they are attributable to the years of service performed during the existence of the community under Sims v. Sims, 358 So.2d 919 (La.1978). Hyde v. Hyde, 96-1725, pp. 3-4 (La.App. 1st Cir.6/26/97); 697 So.2d 1061, 1063, writ denied, 97-1987 (La.11/7/97); 703 So.2d 1274.
If the payments represent compensation that a claimant would have earned if not for his illness, those payments should be classified in accordance with the approach used by the courts in allocating tort damage awards and worker's compensation benefits. *627 Brant v. Brant, 26,508, p. 4 (La.App.2d Cir.1/25/95); 649 So.2d 111, 114. Damages due to personal injuries, including worker's compensation benefits, sustained during the existence of the community by a spouse are separate property. Comment a, La. C.C. art. 2344. The non-injured spouse does not have an interest in the portion of the award designed to compensate the injured spouse for the loss of earnings accruing after termination of the community property regime. This segment of the award, which would be classified as community property during the existence of the regime, is classified as the separate property of the injured spouse upon the termination of the regime. Comment b, La. C.C. art. 2344; Brant v. Brant, 26,508 at 4-5; 649 So.2d at 114.
While our jurisprudence has addressed the classification of disability benefits on numerous occasions,[6] our courts have not addressed the classification of disability annuity benefits received under the Railroad Retirement Act. In order to evaluate the pertinent factors that have been considered in classifying other types of disability benefits, we look to Hyde v. Hyde, supra, a recent decision by this court. In Hyde, the court considered whether monthly disability benefits received by a former husband from his employer were his separate property. Mr. and Mrs. Hyde physically separated on November 5, 1992, and were divorced by a judgment dated June 17, 1993. Mr. Hyde began receiving the monthly disability benefits on December 1, 1992. In a suit to partition the property of the community, Mrs. Hyde contended the disability benefits represented deferred compensation in the form of early retirement benefits, which would be classified as community property. This court determined that the benefits received by Mr. Hyde from December 1, 1992, until he reaches retirement age of sixty-five years, were his separate property.
In making that determination, the Hyde court considered other cases in which this court addressed the issue of the classification of disability benefits, stating as follows:
In Arnaud v. United Brotherhood of Carpenters and Joiners of America, 577 So.2d at 185-86, this court held that disability benefits did not represent deferred compensation. The court noted that the disability portion of the benefits plan had no cash value. The court also noted that if the employee reached age sixty-five (65) without suffering a disability, he would receive no benefit under the plan. Moreover, if the employee returned to work, his monthly benefit would be terminated and his disability pension would be voided. Considering these facts, the court determined that the disability benefits, which constituted post-community loss of earnings, were the employee's separate property. In Johnson v. Johnson, 532 So.2d at 505, this court held that disability benefits received by an employee spouse pursuant to LSA-R.S. 33:2113 .1 were community assets. The disability benefits were paid from a fund comprised, in part, of employee contributions. The disability payment to which the employee was entitled was a percentage of the employee's average compensation. The actual percentage was based on the number of years of service of the injured firefighter. Upon retirement, the accumulated contributions of an employee, together with an amount taken from the pension account, were placed in a reserve account for the payment of future retirement benefits. Considering these facts, this court determined that the disability benefits were community property. The court explained that the firefighter's right to receive compensation for his disability was based entirely on that firefighter's contributions to the fund from community earnings and his years of service as a firefighter. (Footnote omitted.)
Hyde v. Hyde, 96-1725 at 5-6; 697 So.2d at 1064.
*628 In classifying Mr. Hyde's disability benefits as his separate property, the court considered the facts that Mr. Hyde did not make any contributions to the disability plan and that the plan was funded solely from contributions made by his employer. The court also considered that the monthly payment received by Mr. Hyde and the source of the funding of the monthly benefit would change upon Mr. Hyde reaching sixty-two years of age (a portion of the monthly benefit would come from Social Security rather than the employer's disability fund). The court found it significant that Mr. Hyde's disability benefits would terminate if he were able to return to work; if Mr. Hyde had continued to work without suffering from a disabling condition, he would not have been entitled to receive any disability benefits; there was no cash value in the plan; and Mr. Hyde was to receive unreduced retirement benefits at retirement age (65 years old). Weighing all of these factors, the court determined that the disability benefits received by Mr. Hyde as a result of his disability were more representative of compensation for lost earnings due to an inability to work and were properly characterized as his separate property. Hyde v. Hyde, 96-1725, pp. 6-8; 697 So.2d at 1064-1065.
In Arnaud v. United Bhd. of Carpenters and Joiners of America, 577 So.2d 184 (La. App. 1st Cir.), writ not considered, 580 So.2d 369 (La.1991), this court also classified certain disability benefits as separate property income of the disabled spouse. In that case, Mr. Arnaud became disabled and began receiving benefits from the Carpenters Local 1098 Pension Trust more than two years after he was divorced. His former wife claimed that the benefits represented deferred compensation which is community property. The court found the following factors to be significant for classification purposes:
The disability portion of the Trust has no cash value. If an employee reaches the age of 65 without suffering total disability, he would never receive any benefits under that portion of the plan. If at any time plaintiff returns to work, the monthly disability payments would be terminated and the disability pension voided. In addition to disability benefits paid, plaintiff will receive unreduced retirement benefits at age 65, a proportionate interest of which will belong to his ex-wife.
Arnaud v. United Bhd. of Carpenters and Joiners of America, 577 So.2d at 186.
Although Mr. Arnaud's former spouse argued that Johnson v. Johnson, 532 So.2d 503 (La.App. 1st Cir.1988), was controlling, the Arnaud court found the case to be distinguishable from Johnson for the following reasons:
In Johnson, the husband was a member of the Firefighter's Pension and Relief Fund in New Orleans, which is governed by La. R.S. 33:2101 et seq. He suffered an injury and began receiving disability benefits during the existence of the community. On appeal, this court held that the benefits received by Mr. Johnson were an asset of the community formerly existing between the parties. We noted that the right to receive compensation for his disability was based entirely on Mr. Johnson's contributions to the fund from community earnings and his years of service as a firefighter. As the benefits flowed from a community endeavor, we held Mrs. Johnson was entitled to her proportionate share of the payments.
After a reading of the statutes governing the New Orleans Firefighters' Pension, La. R.S. 33:2101, et seq., we do not feel compelled to follow Johnson due to significant differences in the pension plans involved in these two cases. In Johnson, the fund was made up of salary deductions from each member (clearly community funds) and contributions from the fire department. In the case at hand, the Trust is funded solely by employer contributionsno contributions are made by the members. In Johnson, the amount of benefits payed [sic] was based on the number of years of service. Entitlement to benefits in our case is simply based on a minimum requirement of fifteen years of credit in the plan. In the event of termination of employment, the fund in Johnson had a cash value. The disability portion of the Trust in this case has no cash value. Finally, *629 and perhaps most important, if disability continues, a member of the fund in Johnson may never be eligible for ordinary retirement benefits by not being able to meet the minimum service requirements. Clearly, under those circumstances the benefits in Johnson were more in the nature of deferred compensation such as early retirement benefits. In the present case, Mr. Arnaud's disability pension automatically converts to a normal retirement pension at age 65. As such, the disability benefits are more representative of compensation for lost earnings due to inability to work.
Arnaud v. United Bhd. of Carpenters and Joiners of America, 577 So.2d at 186-187.
In the present case, the Lees were married during 1959, Mrs. Lee began working for the Illinois Central Railroad during 1969, and the Lees were divorced during 1991. Mrs. Lee continued to work for the railroad for about two years after the termination of the community. Mrs. Lee underwent surgery during January of 1993, to alleviate carpal tunnel symptoms and was apparently unable to successfully perform her job duties after that date. She applied for disability benefits on March 31, 1994, and began receiving the benefits sometime after that date. Mrs. Lee has worked for the railroad for a total of twenty-five years. At the time of the trial, Mrs. Lee was fifty-seven years old.
While Mrs. Lee has made contributions to the Railroad Retirement Account in the form of taxes deducted from her earnings (with most of those earnings being community property), the Railroad Retirement Account has also received significant funding from the social security system and federal tax revenues. The benefits she receives under the act will not necessarily correlate to the taxes paid by her and on her behalf. While the disability benefits she will receive under the Railroad Retirement Act are tied to her earnings and her career service (see 45 U.S.C. §§ 231a(a)(1) and 231b(b)), Mrs. Lee has no contractual basis for the recovery of benefits. Mrs. Lee's contributions do not have a cash or redemption value.
If Mrs. Lee had reached sixty-five years of age without ever becoming disabled, she would not have been entitled to collect benefits based on her contributions. If Mrs. Lee returns to work or fails to periodically provide satisfactory proof of her continued disability until her retirement age, then the disability benefits shall cease. See 45 U.S.C. § 231a(a)(3). The parties do not dispute that Mrs. Lee's Tier II benefits will convert from disability annuity benefits to a normal retirement pension upon her reaching retirement age. We also note that The Railroad Retirement Act does not provide for a reduced retirement benefit based on the fact that Mrs. Lee is currently collecting disability annuity benefits.
Weighing all of the factors, we find that the Tier II disability annuity benefits are more representative of compensation for lost earnings due to inability to work than deferred compensation. Accordingly, we conclude that these benefits were properly characterized by the trial court as Mrs. Lee's separate property.

THE ORDER FOR MR. LEE TO PAY AN EQUALIZING SUM OF MONEY
Mr. Lee contends the court abused its discretion in ordering him to pay $33,326.69 in cash within the forty-five day time period set forth in the judgment. He asserts that this order has the effect of unfairly requiring him to sell some of the stock that was distributed to him in the community property partition. He would have preferred that Mrs. Lee receive an equalizing payment from the proceeds of the liquidation of a used car business owned by the community. Appellant complains that he was "cut off by the court" in presenting testimony pertinent to the equalizing payment. He urges that the court did not hear the valuable testimony of his son, Kimuel Lee, regarding the value of the used car inventory.
Louisiana Revised Statutes 9:2801 sets forth the procedure for judicial partitions of community property and the settlement of claims after dissolution of the marriage. Specifically, La. R.S. 9:2801(4)(c) provides that "the court shall order the payment of an *630 equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct" in the event that the allocation of assets and liabilities results in an unequal net distribution between the parties. It is well settled that a trial court has broad discretion in adjudicating issues raised in a proceeding for partition of the community regime. Smith v. Smith, 95-0913, p. 10 (La.App. 1st Cir.12/20/96); 685 So.2d 649, 655; Kambur v. Kambur, 94-775, pp. 3-4 (La.App. 5th Cir.3/1/95); 652 So.2d 99, 101-102.
During the trial, Mrs. Lee testified that she was behind in the payment of her bills and needed the equalization of the assets to be made in cash so that she could pay some of these bills. While the court found that neither party had any "necessitous needs," the court concluded that a cash payment from Mr. Lee to Mrs. Lee was the appropriate method to balance the assets of the parties. Although the court did not consider Kimuel Lee's proffered testimony regarding the value of the vehicles, the court was aware of the full inventory of the vehicles based on other evidence introduced during the trial. The court was also aware of the parties' plans to sell the vehicles. Thus, we find no error in the court's exclusion of the evidence regarding the value of the vehicles. This information was not needed for the court to make its decision. Accordingly, we cannot say the trial court abused its broad discretion in ordering the equalizing cash payment to be in a lump sum within a set period of time rather than conditioning the payment on the sale of these vehicles.
Nor can we say the trial court abused its broad discretion in ordering Mr. Lee to make the equalizing payment in cash within forty-five days of the judgment. The record establishes Mr. Lee had adequate notice and sufficient time to produce the cash payment, particularly since the court's written reasons addressing this payment were issued two months prior to the date of the written judgment ordering the payment to be made within forty-five days.

CONCLUSION
For the above reasons, the judgment of the trial court is affirmed. The appeal costs are to be paid by defendant-appellant, Milford (NMI) Lee.
AFFIRMED.
NOTES
[1] The parties had stipulated that "one-half of any proceeds arising from vehicles sold subsequent to termination of the community property regime shall be reimbursed by [Mr. Lee] to [Mrs. Lee] out of the proceeds of the sale of the vehicles...."
[2] The record establishes the monthly Tier I benefit paid to Mrs. Lee is $1,134.00.
[3] The court also addressed two other issues in dispute. One issue involved the sale of 192 shares of Dow Chemical Stock by Mr. Lee following the termination of the community. The court found the sale to be in violation of an injunction which prohibited Mr. Lee from selling community property. The court found Mrs. Lee was entitled to reimbursement from Mr. Lee in the amount of $2,040.00, one-half the value of the stock as of July 9, 1996. The other issue addressed whether Mr. Lee was responsible for the cost of the replacement of six Dow Chemical Company stock certificates which were missing. The court determined that the community should bear the cost of replacing the stock certificates. The court ordered Mr. Lee to pay an equalizing cash payment of $33,326.69 to Mrs. Lee. This amount includes the $2,040.00 to be paid by Mr. Lee for reimbursement of one-half of the value of the 192 shares of Dow Chemical Company stock. Otherwise, these issues are not pertinent to the issues raised on appeal.
[4] Judge Celia R. Cangelosi, serving pro tempore, presided at the July 10, 1996 hearing and issued the October 1, 1996 written reasons for judgment. Judge Kay Bates signed the December 3, 1996 judgment.
[5] Mr. Lee complains that he was not allowed to introduce certain evidence which would have established the true nature of the Tier II disability benefits. However, no testimony was proffered which is pertinent to the classification of these benefits. It is well-settled that a party who contends his evidence was improperly excluded is required to make a proffer of the evidence, and if he fails to do so, he cannot contend such exclusion was erroneous. Osborne v. Ladner, 96-0863, p. 5 (La.App. 1st Cir.2/14/97); 691 So.2d 1245, 1251; Hurts v. Woodis, 95-2166, p. 12 (La.App. 1st Cir.6/28/96); 676 So.2d 1166, 1175. Because Mr. Lee failed to make a proffer of evidence pertaining to the classification of these benefits, he cannot contend an exclusion of such evidence was erroneous.
[6] See Hyde v. Hyde, 96 1725 (La.App. 1st Cir.6/26/97); 697 So.2d 1061, writ denied, 97-1987 (La.11/7/97); 703 So.2d 1274; Mercer v. Mercer, 95-1257 (La.App. 3d Cir.4/3/96); 671 So.2d 937; Brant v. Brant, 26,508 (La.App.2d Cir.1/25/95); 649 So.2d 111; Arnaud v. United Brotherhood of Carpenters and Joiners of America, 577 So.2d 184 (La.App. 1st Cir.), writ not considered, 580 So.2d 369 (La.1991); Johnson v. Johnson, 532 So.2d 503 (La.App. 1st Cir.1988), and Lachney v. Lachney, 529 So.2d 59 (La.App. 3d Cir.), writ denied, 532 So.2d 764 (La.1988).